ORIGINAL

1  LAW OFFICES OF STEVEN C. VONDRAN, P.C.
   Steven C. Vondran, Esq. (SBN 232337)
2  620 Newport Center Drive, Suite 1100
   Newport Beach, CA 92660
3  Phone: (949) 689-8752
   Fax: (949) 209-0358
4  Email: Steve@VondranLaw.com

5

6  Attorney for Debtor: Deanna Eileen Rachlin

FILED

SEP 01 2010

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ Deputy Clerk

7          UNITED STATES BANKRUPTCY COURT

8        FOR THE CENTRAL DISTRICT OF CALIFORNIA

9

10 In Re:                              )  Case No: 2:10-BK-24246-RN
   DEANNA EILEEN RACHLIN              )
11      Debtor                         )  **DEBTORS REPLY TO DEUTSCHE**
                                       )  **BANK'S OPPOSITION TO DEBTOR'S**
12 --------------------------------    )  **VIOLATION OF AUTOMATIC STAY**
                                       )  **BRIEF**
13 DEUTSCHE BANK NATIONAL TRUST        )
   COMPANY, AS TRUSTEE OF THE          )  ORAL ARGUMENT REQUESTED
14 INDYMAC INDX MORTGAGE LOAN          )
   TRUST 2006-AR14, MORTGAGE PASS-     )  Hearing Date: 9/8/10
15 THROUGH CERTIFICATES, SERIES 2006-  )  Time: 9:00 a.m.
   AR14 UNDER THE POOLING AND          )  Ctrm: 1645
16 SERVICE AGREEMENT DATED             )  Floor: 16th
   OCTOBER 1, 2006.                    )
17      Movant                         )
                                       )
18                                     )
                                       )
19 v.                                  )
                                       )
20                                     )
   DEANNA EILEEN RACHLIN               )
21      Debtor                         )
                                       )
22                                     )
   And                                 )
23 ELISSA MILLER, CHAPTER 7 TRUSTEE    )
                                       )
24                                     )
                                       )
25                                     )
                                       )
26

27              **I.**
             **KEY POINTS**

28

1. **Deutsche is purporting to be the "owner" (beneficiary) of Plaintiffs loan but Deutsche never loaned Plaintiff any money, and cannot prove that it loaned Plaintiff any money as Duetsche is a mere *Trustee* of a Mortgage Backed Security Trust that may or may not even hold Plaintiff's loan.**

As Trustee of the *Indymac INDX Mortgage Loan Trust 2006-AR14* loan trust, Deutsche is acting in a stated Trustee capacity administering the trust (if Plaintiff's loan is in fact part of the trust). Deutsche Bank has not, on information and belief, loaned Plaintiff any money and for that reason cannot be the *real party in interest* to file the lift stay motion and they have no standing to assert such rights on behalf of the true owner.

In fact, the only party that would have standing to bring the motion is the TRUE OWNER of the Loan (that is, the *party that stands to lose money if the mortgage is not paid*), in the case of securitized loans, that is the "investor" who invested in the mortgage-backed-security (hedge funds, insurance company, pension fund, etc). Deutsche has made no allegation that it was such an investor who stands to lose financially if the loan is not paid.

Rather, Deutsche admits they are the Trustee of the Indymac Trust. The Trustees duties are normally limited to various administrative duties, and may serve as a custodian of documents, such as a pooling and servicing agreement. But the Trustee has no ownership rights and no economic interest in Plaintiff's loan and should not be permitted to file whatever documents it wants in a court of law where they cannot definitively establish the legal right to do so.

2. **Deutsche claims to have "*been in possession of*" the "*original note*" since October 2, 2006 (two months after the loan was originated by Quicken Loans in August 2006). Therefore, Deutsche claims to be the owner of the loan. But how can that be when the loan was to be included in a pool of loan in the Indymac Trust and the ownership of the loans was therefore vested in the "*investors*" who purchased the mortgage backed securities? Are there TWO owners of Plaintiff's loans? The Wall Street Investors who stand to lose money if the loan is defaulted on, AND Deutsche, the Trustee of the Trust?**

DEBTORS REPLY TO DEUTSCHE'S OPPOSITION REGARDING VIOLATION OF THE STAY

3. **In regards to "being in possession of the original note" Deutsche is apparently claiming to be the "holder in due course" of the loan. But being the holder would require that they paid value for the note. There is no allegation Deutsche paid any value for the note (i.e. that it purchased the loan from Quicken) even if it does have physical possession of a note made out to bearer.** Under *California Commercial Code Section 3302.*

(a) Subject to subdivision (c) and subdivision (d) of Section 3106, "holder in due course" means the **holder** of an **instrument** if **both of the following apply:**

(1) The instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity, and: (2) The holder took the instrument: (A) **for value,** (B) in good faith, and (C) without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series. (other portions omitted as not relevant).

Here Deutsche is claiming to be the *owner* of the loan by virtue of possession of the note (electronic copy perhaps and this point is unclear). Again, if Defendant is the real party in interest, they should be require to prove they paid value in order to make a colorable claim that they have a right to lift the automatic stay. And there is no legal authority found that would indicate an electronic "copy" or "original bearer paper" suffices as legal prove of loan ownership.

4. **Bearer paper should not be sufficient proof of standing and real party in interest where the proponent of such evidence refuses to bring such evidence into a court of law for inspection. It is possible that mistakes are made, especially in regard to securitized loans, the Court should demand that the original note (if such exists) be produced for inspection and that this issue be resolved by legal proof rather than self-servicing declarations. On information and belief, Deutsche has nothing more than a "electronic copy of an original note" (bearer paper) which, if true, would be just as enforceable by both the Court and Plaintiff who also possess the same copy.** The relevant note at issue is "bearer paper" and requires physical possession of the original to prove that Deutsche has the legal right to enforce the debt Plaintiff is alleged to owe

DEBTORS REPLY TO DEUTSCHE'S OPPOSITION REGARDING VIOLATION OF THE STAY

1   Deutsche. The Declarations of Defendant are not sufficient to ensure compliance with legal

2   standards previously outlined. Mainly, Defendant must be required to bring the original

3   document to court. For bearer paper cannot be enforced without producing the original (non-

4   electronic) version of the document. Anything less is unenforceable. If the note is not legally

5
    enforceable, and if Deutsche cannot produce a (non-electronic) copy of the note, then Duetsche
6
    had no right to file the lift stay motion in the first place as it would have had no standing to lift
7
8   the stay. **Which is why Plaintiff argues that the attempt by MERS to assign the note and**

9   **Deed of trust (after the stay was in effect and before Deutsche had a legally enforceable**

10  **lien) was an act to *create or perfect the lien*, which on information and belief Deutsche never**

11
    **had. Again, a lien requires the note and the deed of trust. MERS attempted to assign both**
12
    **while the automatic stay was in effect.**
13

14      5. **The cases cited by Defendant do not adequately address the violation of stay issue**
        **given the facts of this case**.
15  i. Lane v. Vitek Real Estate Indus Group (cited on page 2 line 23 of Defendants opposition)

16
            The debtor was not in bankruptcy. As the Court stated: "If plaintiffs were in
17
    bankruptcy they clearly would lack standing to bring this action absent abandonment of their
18
19  claims by the bankruptcy trustee. However, plaintiffs continue to have standing to pursue this

20  case because their bankruptcy petition was dismissed...." Also, this case is in direct conflict

21
    with the *In re Walker* case which Defendant has chosen not to address (which shows the Eastern
22
    District is in Conflict on this important issue). As was held in Walker:
23

24  (a) In California, to perfect the transfer of mortgage paper as collateral, *the OWNER should*

25      *PHYSICALLY DELIVER the NOTE to the transferee*. Bear v. Golden Plan of

26      California, Inc., 829 F.2d 705, 709 (9th Cir. 1986)............"*without physical transfer*

27      *(of the note) the sale of the note could be invalid as a fraudulent conveyance* (under

28      Cal. Civ. Code Section 3440) or as **UNPERFECTED** (under Cal. Com. Code 9313-

        9314)" See Roger Bernhardt, California Mortgages and Deeds of Trust and Foreclosure

Page 4

Litigation Section 1.26 (4th ed. 2009).

(b) As previously cited by Plaintiff, the *Walker* Court also stated MERS had no interest in the note or deed of trust to assign as pointed out in our brief.

(ii) Kapila v. Atl Mortgage & Investment Corp (cited on page 4 line 12 of Defendants opposition as support that there was no stay violation). This case did not even deal with a violation of the automatic stay. The case dealt with whether or not the trustee possessed avoidance power under Section 544 of the Bankruptcy Code where "property of the debtor is transferred." Case is off point.

(iii) In re Cook (cited on page 4 line 12 of Defendants opposition as support that there was no stay violation). Case is also off point as it discusses the "owner" of a loan being able to transfer the loan post-petition without violating the stay. MERS did not "own" the loan in the present case, and this type of assignment is not immune from stay violation.

**6. On information and belief, Deutsche does not particpate in HAMP modifications contrary to the declarations filed with the Court**

See attached **Exhibit "A"** which is a copy of a deposition in another case involving OneWest (formerly Indymac) - who also serviced Deutsche loans – wherein a Vice President for OneWest indicates *Deutsche Bank does NOT participate in HAMP*. (See page 61 and 62).

**7. Plaintiff objects to the Declaration filed by Deutsche on various grounds to be reserved for oral argument (lack of personal knowledge as to possession of the note, and HAMP modification, and serial signings by declarant). Further evidence will be offered at hearing.**

Dated: September 1, 2010        LAW OFFICES OF STEVEN C. VONDRAN, P.C.

By: _____
STEVEN C. VONDRAN, ESQ.
ATTORNEY FOR DEBTOR
DEANNA EILEEN RACHLIN

DEBTORS REPLY TO DEUTSCHE'S OPPOSITION REGARDING VIOLATION OF THE STAY

**EXHIBIT "A"**

**CONSOR & ASSOCIATES**
Reporting and Transcription, Inc.

1 (Pages 1 to 4)

Page 3

**Page 1**

IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT IN
AND FOR PALM BEACH COUNTY, FLORIDA
CASE NO. 50 2008 CA 037322XXXX MB AW
INDYMAC FEDERAL BANK, FSB,
  Plaintiff,
vs.
ISRAEL A. MACHADO; NEENA M. MACHADO;
ANY AND ALL UNKNOWN PARTIES CLAIMING BY,
THROUGH, UNDER, AND AGAINST THE HEREIN
NAMED INDIVIDUAL DEFENDANT(S) WHO ARE NOT
KNOWN TO BE DEAD OR ALIVE, WHETHER SAID
UNKNOWN PARTIES MAY CLAIM AN INTEREST AS
SPOUSES, HEIRS, DEVISEES, GRANTEES, OR OTHER
CLAIMANTS; TENANT #1, TENANT #2, TENANT #3,
and TENANT # 4, the names being fictitious
to account for parties in possession,

  Defendants.

THE DEPOSITION OF
ERICA A. JOHNSON-SECK
VOLUME I
Pages 1 - 84

July 9, 2009
1655 Palm Beach Lakes Boulevard
West Palm Beach, Florida
12:54 p.m. - 2:59 p.m.

REPORTED BY:
Deborah H. Rodgers, CSR
Consor & Associates Reporting & Transcription
1655 Palm Beach Lakes Boulevard, Suite 500
West Palm Beach, Florida 33401
Phone: 561.682.0905

**Page 3**

    I N D E X
1
2        PAGE
3 TESTIMONY OF ERICA A. JOHNSON-SECK
4  Direct Examination by Mr. Ice  4
5 CERTIFICATE OF OATH    215
6 CERTIFICATE OF REPORTER   216
7 ERRATA SHEET    217
8 ERRATA CERTIFICATE   218
9 READ AND SIGN NOTIFICATION  219
10
11    E X H I B I T S
12 NUMBER      PAGE
13 Defendants' Exhibits A - Q  4
  Defendants' Exhibit R   88
14 Defendants' Exhibit S   113
  Defendants' Exhibit T   114
15 Defendants' Exhibit U   162
  Defendants' Exhibit V   167
16 Defendants' Exhibit W   174
  Defendants' Exhibit X   179
17 Defendants' Exhibit Y   181
  Defendants' Exhibit Z   204
18
19
20
21
22
23
24
25

**Page 2**

1 APPEARANCES:
2 On behalf of the Plaintiff:
3  JOSEPH MANCILLA, JR., ESQ.
   Florida Default Law Group, P.L.
4  9119 Corporate Lake Drive
   Suite 300
5  Tampa, Florida 33634
6 On behalf of the Defendants:
7  THOMAS E. ICE, ESQ.
   DUSTIN A. ZACKS, ESQ.
8  Ice legal, P.A.
   1975 Sansburys Way, Suite 104
9  West Palm Beach, Florida 33411
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1 THEREUPON,
2  (Thereupon, Defendants' Exhibits No. A
3 through Q were marked for identification.)
4 THEREUPON,
5  ERICA A. JOHNSON-SECK,
6 was called as a witness herein, and after being first
7 duly sworn, testified as follows:
8  THE WITNESS: Yes.
9  DIRECT EXAMINATION
10 BY MR. ICE:
11 Q. Could you state your full name for the
12 record, please.
13 A. Erica Antoinette Johnson-Seck.
14 Q. And what is your business address?
15 A. 7700 West Parmer Lane, P-A-R-M-E-R, Building
16 D, Austin, Texas, 78729.
17 Q. And who is your employer?
18 A. OneWest Bank.
19 Q. How long have you been employed by OneWest
20 Bank?
21 A. Since March 19th, 2009.
22 Q. Prior to that you were employed by IndyMac
23 Federal Bank, FSB?
24 A. Yes.
25 Q. And prior to that you were employed by

**Censor & Associates**
Reporting and Transcription, Inc.

## Page 5

1　IndyMac Bank, FSB?
2　　A.　Yes.
3　　Q.　Your title with OneWest Bank is what?
4　　A.　Vice president, bankruptcy and foreclosure.
5　　Q.　That hasn't changed in all the various
6　IndyMac carnations -- incarnations, I should say?
7　　A.　No.
8　　Q.　Now, the IndyMac Bank, FSB ceased to exist
9　July 11th of last year, correct?
10　　A.　Yes.
11　　Q.　That was taken over by the FDIC, correct?
12　　A.　Yes.
13　　Q.　And that's when IndyMac Federal Bank, Federal
14　Bank, FSB took over?
15　　A.　Yes.
16　　Q.　And then as of March 19th of this year,
17　OneWest came in and purchased the assets of IndyMac
18　Federal Bank?
19　　A.　Yes.
20　　Q.　Now, the plaintiff in this case is IndyMac
21　Federal Bank, FSB, correct?
22　　A.　Yes.
23　　Q.　When I say this case, I know we're scheduled
24　for two depositions.  I don't know if you know we're
25　starting with the Machado case.

## Page 6

1　　A.　Okay.
2　　Q.　Would you agree with me that the plaintiff in
3　this case, the Machado case, no longer exists?
4　　A.　Yes.
5　　Q.　Are you also an officer of Mortgage
6　Electronic Registration Systems?
7　　A.　No.
8　　Q.　You have signing authority to sign on behalf
9　of Mortgage Electronic Registration Systems as a vice
10　president, correct?
11　　A.　Yes.
12　　Q.　Are you an officer of any other corporation?
13　　A.　No.
14　　Q.　Do you have signing authority for any other
15　corporation?
16　　A.　Yes.
17　　Q.　What corporations are those?
18　　A.　IndyMac Federal Bank, IndyMac Bank, FSB, FDIC
19　as receiver for IndyMac Bank, FDIC as conservator for
20　IndyMac, Deutsche Bank, Bank of New York, U.S. Bank.
21　And that's all I can think of off the top of my head.
22　　Q.　What was the one before U.S. Bank of New
23　York?
24　　A.　Bank of New York.
25　　Q.　Bank of New York.  Is that Bank of New York

## Page 7

1　Mellon?
2　　A.　I don't know.
3　　Q.　When you say you have signing authority, is
4　your authority to sign as an officer of those
5　corporations?
6　　A.　Some.  Deutsche Bank I have a POA to sign as
7　attorney-in-fact.  Others I sign as an officer.  The
8　FDIC I sign as attorney-in-fact.  IndyMac Bank and
9　IndyMac Federal Bank I now sign as attorney-in-fact.
10　And now I only sign as a vice president for OneWest.
11　　Q.　As part of your job, how often do you give
12　depositions?
13　　A.　Twice a month.
14　　Q.　So you're familiar with the deposition
15　process and what the rules are and what the court
16　reporter is doing and that you're under oath?
17　　A.　Yes.
18　　Q.　Okay.  I don't need to explain all of those
19　things to you?
20　　A.　No.
21　　Q.　Your job duties include supervision of three
22　direct reports and 52 employees?
23　　A.　It did.
24　　Q.　Okay.  How's that changed?
25　　A.　Let's see.  Now I have two direct reports and

## Page 8

1　47 people with 17 openings.
2　　Q.　Openings meaning you're looking for someone
3　to fill those positions?
4　　A.　Yes.
5　　Q.　Are you in charge of the loss mit department?
6　　A.　No.
7　　Q.　Who is?
8　　A.　Karen Mastro is the senior vice president of
9　loss mit.
10　　Q.　Can you spell the last name, please?
11　　A.　M-A-S-T-R-O.  Oh, I'm sorry.  She is the
12　first vice president.
13　　Q.　Is she nevertheless in charge of the loss mit
14　department?
15　　A.　Yes.
16　　Q.　Do you have the authority to settle any
17　foreclosure case?
18　　A.　Up to a certain dollar amount of loss, yes.
19　　Q.　How is that dollar amount of loss determined?
20　　A.　It depends on what the settlement offer looks
21　like.  Are you asking me how -- I mean, it depends.
22　　Q.　Who sets the dollar amount?
23　　A.　The senior executive committee.
24　　Q.　Of IndyMac?
25　　A.　Of IndyMac, but it was adopted by IndyMac

**Censor & Associates**
Reporting and Transcription, Inc.

### Page 9

1   Federal and has been adopted by OneWest, yes.
2       Q.  I'll probably be doing that all afternoon.
3   So thank you for correcting me.  If OneWest is the
4   correct answer to that, please feel free to let me
5   know.
6       As part of your job duties, you personally manage
7   the attorney network?
8       A.  Yes.
9       Q.  What other job duties do you have?
10      A.  I manage the bankruptcy and the foreclosure
11  process.  I also manage the breach process, the
12  compliance of the breach letters as changes are made by
13  different states and jurisdictions.  And I manage a
14  default, a forensic default group, research group that
15  handles everything that's high loss related, compliance
16  related, high level research.
17      Q.  Can you give me an example of what this
18  forensic group default would be researching?
19      A.  We foreclose on a property where the investor
20  won't cover the advances we've made.  So one of the
21  auditors would look to see if we got approval to make
22  that advance, if there's some reason we wouldn't be
23  getting approval for it, work with the investor to try
24  to get approval or work to bill it back to our
25  outsource vendor or one of the firms -- now, this is

### Page 10

1   one of very many things that they do -- were at fault
2   for a reason why we can't claim for the advances;
3   taxes, let's say.
4       Q.  So when you say high loss, you're referring
5   to the losses that OneWest is experiencing versus the
6   investor that you're doing the work for?
7       A.  That's another facet of what's managed in
8   that group.  That example I gave you is not necessarily
9   a high-loss example.  High loss is anything with a loss
10  between the total debt and the current value of 250 or
11  more.  So those loans, whether it is owned by the bank
12  or owned by an investor, are scrutinized because the
13  losses are large.
14      Q.  And you said that's losses greater than
15  250,000?
16      A.  Yes.
17      Q.  If a property goes to foreclosure and the
18  ultimate recovery is more than $250,000 of the debt on
19  that property, is that something that the forensic
20  default group would study?
21      A.  Not from that perspective.
22      Q.  In other words, they're not concerned about
23  losses due to property values going down?
24      A.  That's economic, so it's baked into the
25  equation of what they would review, but an economic

### Page 11

1   reason, like the property values going down in the
2   state of California, if something statistical, it
3   doesn't mean that they don't review it the same way
4   they would review something that was not statistical,
5   but we do -- we are keeping in mind that property
6   values are decreasing everywhere.  The high-loss value
7   used to be $100,000 when I first started working at
8   IndyMac Bank and has increased to 250,000 for that
9   reason.
10      Q.  Would it study a case where a voluntary
11  dismissal was entered and the opposing counsel had to
12  be paid fees?
13      A.  No.
14      Q.  No?
15      A.  No.
16      Q.  Any other job duties that we haven't talked
17  about?
18      A.  No.
19      Q.  One of your job duties is to sign documents?
20      A.  Yes.
21      Q.  Do you still spend an hour a day signing
22  documents?
23      A.  No.
24      Q.  Okay.  How much time do you spend a day now?
25      A.  Ten minutes, maybe.

### Page 12

1       Q.  Is that because you're signing fewer
2   documents?
3       A.  Actually, from the last time we spoke, there
4   are more that have to be signed by the bank.  The FDIC
5   did not agree that our outsource vendor, who had power
6   of authority to sign for some docs, that they didn't
7   like that idea so all the docs came in-house.  We lost
8   a couple of VPs, which is why I, at that time, was the
9   main signer.  Now there are four VPs signing documents
10  or that can sign foreclosure documents, and most do,
11  and my supervisors are now approved signers.
12      Q.  Those are among the four that you mentioned?
13      A.  In addition to.
14      Q.  Okay.  So how many total in your department
15  have authority to sign documents?
16      A.  In my department, just specifically in my
17  department for foreclosure- and bankruptcy-related
18  documents, four of us, but my peers are alternative
19  signers to me, and I have three peers that can sign as
20  an alternative to my signature.
21      Q.  And when you say peers, these are
22  vice-presidents --
23      A.  Yes.
24      Q.  -- of other departments?
25      A.  Yes.

**Censor & Associates**
Reporting and Transcription, Inc.

## Page 13

1    Q.  Okay.  How is the decision made as to who
2    will sign what documents?
3    A.  There really is not a matrix.  Only so many
4    of us can sign Lost Note Affidavits.  I happen to be
5    the only one in my department, besides my boss, that
6    can sign a Lost Note Affidavit, so all those would come
7    to me.  Other than that, there's not a -- I think they
8    just try to make it even.
9    Q.  Just distribute them evenly?
10    A.  Yes.
11    Q.  Okay.  How many documents would you say that
12    you sign on a week on average, in a week on average?
13    A.  I could have given you that number if you had
14    that question in there because I would have brought the
15    report.  However, I'm going to guess, today I saw an
16    e-mail that 1,073 docs are in the office for signing.
17    So if we just -- and there's about that a day.  So
18    let's say 6,000 a week and I do probably -- let's see.
19    There's eight of us signing documents, so what's the
20    math?
21    Q.  Six thousand divided by eight, that gives me
22    750.
23    A.  That sounds, that sounds about right.
24    Q.  Okay.  That would be a reasonable estimate of
25    how many you sign, you personally sign per week?

## Page 14

1    A.  Yes.
2    Q.  And that would include Lost Note Affidavits,
3    Affidavits of Debt?
4    A.  Yes.
5    Q.  What other kind of documents would be
6    included in that?
7    A.  Assignments, declarations.  I can sign
8    anything related to a bankruptcy or a foreclosure.
9    Q.  How long do you spend executing each
10    document?
11    A.  I have changed my signature considerably.
12    It's just an E now.  So not more than 30 seconds.
13    Q.  Is it true that you don't read each document
14    before you sign it?
15    A.  That's true.
16    Q.  The procedure that we talked about last time,
17    and I will go over it again to see if that's still the
18    procedure, before you would sign an Affidavit of
19    Debt --
20    A.  Yes.
21    Q.  -- it goes to your foreclosure specialist who
22    makes sure that the information is correct?
23    A.  The figures are correct, yes.
24    Q.  It is fair to say that you don't personally
25    check the accuracy of anything in the documents that

## Page 15

1    you're signing?
2    A.  Not, it's not clear that I don't check
3    anything.  The figures I don't, I do not check.  We
4    have a QC process around that used to be a 100 percent
5    of the Affidavits of Debts and any figures for loans
6    and bankruptcy, that have now been reduced to 10
7    percent because the errors were relatively low.  Now I
8    pay, what I pay most attention to is the jurat and what
9    entity I'm signing for, which is why I said 30 seconds
10    instead of two seconds.
11    Q.  Right.  Now, when you say 10 percent, that
12    means that they're spot checking 10 percent of the
13    documents to make sure that they're accurate?
14    A.  The outsource or our outsource vendor checks
15    the document completely.  I'm QCing my outsource vendor
16    with the 10 percent, yes.
17    Q.  When you say outsource vendor, you're talking
18    about LPS?
19    A.  Yes.
20    Q.  Does LPS put the figures in the affidavit?
21    A.  No.
22    Q.  Who puts the figures in the affidavit?
23    A.  It depends on what relationship we have with
24    our firms.  Usually we download the information through
25    process management, the system we use to communicate

## Page 16

1    with our firms, and they will populate the document.
2    Or sometimes we get it in blank and a foreclosure or a
3    bankruptcy specialist would populate the document.
4    Q.  And when you say "they" would populate the
5    document, you're talking about the attorneys?
6    A.  Someone in the firm, yes.
7    Q.  Might be a paralegal, correct?
8    A.  Maybe.
9    Q.  Then those are sent, after they're populated
10    or filled out by someone at the law firm, those are
11    sent to LPS?
12    A.  They're sent -- they're uploaded into the
13    system, like an image copy, and then LPS prints it off,
14    and they go through their various checks and balances,
15    and then based on a matrix that we have provided, they
16    will look to see if this is an entity any of us can
17    sign for.  They may reject it back to the firm and say
18    Indy -- OneWest Bank can't sign for it, or they will
19    ship the document to our -- because these documents get
20    printed in Minnesota.  The documents get shipped to our
21    Austin office.  Those folks again look to make sure
22    it's something that an officer of OneWest Bank in
23    Austin can sign for it and, I mean, that's basically
24    how we get it.
25    Q.  When you say "those folks" check again,

**ñsor & Associaτes**
Reporting and Transcription, Inc.

### Page 17

1 you're talking about your own staff when the documents
2 arrive?
3    A.  No, we have LPS on site.
4    Q.  In Austin?
5    A.  Yes.
6    Q.  Take me through the procedure for getting
7 your actual signature on the documents once they've
8 gone through this quality control process.
9    A.  The documents are delivered to me for
10 signature and I do a quick purview to make sure that
11 I'm not signing for an entity that I cannot sign for.
12 And I sign the document and I hand it to the Notary,
13 who notarizes it, who then hands it back to LPS, who
14 uploads the document so that the firms know it's
15 available and they send an original.
16    Q.  "They" being LPS?
17    A.  LPS, yes.
18    Q.  Are all the documents physically, that you
19 were supposed to sign, are they physically on your
20 desk?
21    A.  Yes.
22    Q.  In your office?
23    A.  Yes.
24    Q.  You don't go somewhere else to sign
25 documents?

### Page 18

1    A.  No.
2    Q.  When you sign them, there's no one else in
3 your office?
4    A.  Sometimes.
5    Q.  Well, the Notaries are not in your office,
6 correct?
7    A.  They don't sit in my office, no.
8    Q.  And the witnesses who, if you need witnesses
9 on the document, are not sitting in your office?
10    A.  That's right.
11    Q.  So you take your ten minutes and you sign
12 them and then you give them to the supervisor of the
13 Notaries, correct?
14    A.  I supervise the Notaries, so I just give them
15 to a Notary.
16    Q.  You give all, you give the whole group that
17 you just signed to one Notary?
18    A.  Yes.
19    Q.  Last time we talked about that there were a
20 group of Notaries and that you had a supervisor that
21 manages a group of loans and passes them out to the
22 different Notaries. Has that changed?
23    A.  It used to go to -- well, a little bit. It
24 used to go – and that's with the shift of people
25 leaving and people coming with everything that's been

### Page 19

1 going on with the bank. All the documents went to one
2 of my supervisors, who manages the default forensic
3 group, and she would pass it out. That's what I was
4 describing to you.
5    We don't have to have a process like that any more
6 now because everyone's in a groove now with what the
7 process should be. So we don't have to manage someone
8 physically making sure everyone's notarizing. So now I
9 just walk out of my office and hand them to one of my
10 folks that can notarize that don't report directly to
11 me. They still report up to their supervisor and then
12 those direct reports report to me.
13    Q.  And does that Notary notarize all of those
14 documents, or does she then distribute them to various
15 Notaries?
16    A.  He or she would notarize all the documents I
17 handed them.
18    Q.  Do they still have the requirement of
19 returning them notarized within 24 hours?
20    A.  That got tough. That is tough. That's where
21 we would like to be but we aren't. It takes us about a
22 week for it to go through the process of verifying the
23 information, getting it on my desk, me signing it,
24 getting it to a Notary, and getting uploaded. So we
25 have document delays.

### Page 20

1    Q.  I'm mostly interested in how long it takes
2 for the Notary to notarize your signature.
3    A.  I can't say categorically because the Notary,
4 that's not the only job they do, so.
5    Q.  In any event, it doesn't have to be the same
6 day?
7    A.  No.
8    Q.  When they notarize it and they put a date
9 that they're notarizing, is it the date that you signed
10 or is it the date that they're notarizing?
11    A.  I don't know.
12    Q.  When you execute a sworn document, do you
13 make any kind of a verbal acknowledgment or oath to
14 anyone?
15    A.  I don't know if I know what you're talking
16 about. What's a sworn document?
17    Q.  Well, an affidavit.
18    A.  Oh. No.
19    Q.  In any event, there's no Notary in the room
20 for you to --
21    A.  Right.
22    Q.  – take an oath with you, correct?
23    A.  No, there is not.
24    Q.  In fact, the Notaries can't see you sign the
25 documents; is that correct?

## Page 21

1  A. Not unless they made it their business to do
2  so.
3  Q. To peek into your office?
4  A. Yes.
5  Q. At what point does the document get to the
6  witnesses for signature?
7  A. The witnesses are, generally, are LPS
8  on-sites, but if it's a witness, like if it has to be
9  an authorized witness, then it would have my name and
10  one of my peer's names or my name and my boss's name.
11  And I would have a cover sheet on top of a stack that
12  would say Erica and Eric. So after I signed, I would
13  walk them over to my boss for him to sign.
14  Q. Okay. But you're talking about documents
15  that have dual signatures?
16  A. Some that require dual signatures. If it's
17  just a witness, it doesn't have to be an authorized
18  signer, then other LPS on-sites will witness.
19  Q. And do they do that before or after the
20  notarization?
21  A. I don't know. I want to say after, but I
22  really don't know. I haven't picked apart that
23  process.
24  Q. Well, it seems logically, when you get the
25  document, there's no witness signatures on there,

## Page 22

1  correct?
2  A. No.
3  Q. And you said that you take them and you give
4  them to the Notary. You don't give them to the witness
5  to sign, correct?
6  A. That's right.
7  Q. So logically it would have to go from the
8  Notary then to the witness?
9  A. Well, yes. Yes, that's logical. I just
10  really don't know.
11  Q. Let me jump back a moment to our discussion
12  about the quality control that goes on at LPS. Do you
13  have any familiarity with what they do per the quality
14  control in Minnesota?
15  A. I've been told what they do, yes.
16  Q. And what is it that you were told that they
17  do?
18  A. For each of their clients, they have a matrix
19  of who that client can sign for. And the processors
20  that work in Minnesota, when they print the documents
21  off line, they're checking to see if it's a document
22  that their client can sign for. They're checking to
23  see if that the document is aesthetically correct,
24  looks, you know, looks like it should look. They check
25  to see that the document includes the number of pages

## Page 23

1  that it's supposed to include. They check that the
2  document has the appropriate cover letter with the loan
3  number on it and that document does not have the loan
4  number on it for states that have the privacy act. I
5  went through a presentation with what they do, and I
6  want to say there was eight or nine different
7  checkpoints.
8  Q. Did that presentation, was a report included
9  with that that you could read what they were saying?
10  A. Yes, and there actually is a report that the
11  LPS folks use in Minnesota for what they reject back to
12  the firms because the documents aren't accurate.
13  Q. Do you still have a copy of that report?
14  A. I can find one. You didn't list that in your
15  list of things.
16  Q. Yeah. I didn't mean do you have it in here,
17  but is it somewhere where you could get it for us if we
18  needed it?
19  A. Yes.
20  Q. Okay. Did they say that they check the
21  numbers that are in the affidavits?
22  A. There's no way they can check the numbers,
23  no.
24  Q. Do they have access to the computer program
25  that tracks all the debt numbers?

## Page 24

1  A. LPS, in itself, has access to its client's
2  system mainframe because they do screen scrapes from
3  the systems to get data. I don't know if the
4  individual person that does docs has that access.
5  Q. Okay. Do you know who over at LPS would know
6  that information?
7  A. How high do you want to go? Do you want the
8  president of, Scott Barns, president of default?
9  Q. Okay. I'd like to talk about the procedure
10  for referring a loan for foreclosure. That's done in
11  your department, correct?
12  A. Yes.
13  Q. It's done by a person with the title of
14  foreclosure specialist?
15  A. Yes.
16  Q. And foreclosure specialists are folks that
17  report to you?
18  A. They report to one of the supervisors who
19  reports to me, yes.
20  Q. To one of your two direct reports?
21  A. Yes.
22  Q. The decision is made to send the case to LPS.
23  That's that first step in the procedure, correct?
24  A. No. The first step is to see if the loan is
25  ripe for referral; and, in conjunction with that, if

**Censor & Associates**
Reporting and Transcription, Inc.

## Page 25

1  that were following the investor's guidelines for its
2  prescribed plan to refer the loan.
3      Q.  When you say "ripe for referral," what sort
4  of things determine whether it's ripe?
5      A.  Is the loan delinquent.  How much contact
6  have we had with the, have we, at OneWest Bank, had
7  with the borrower.  Is there anything unresolved.  Did
8  the borrower call in and has been expecting a phone
9  call back, in which case we're not going to refer it
10  until the borrower received that phone call.  Is there
11  anything unresolved, like a payment plan, some
12  discussion about a payment plan and a payment was to be
13  expected, you know, three days from today, in which
14  case the referral specialist won't refer it because
15  we're expecting a payment.
16      So they're like, they are really the first
17  gatekeepers to insure that nothing gets referred that
18  shouldn't be, because then we pay attorney fees and we
19  have to take that out, you know, that comes straight
20  from the bottom line.
21      Q.  When you say whether it's delinquent, is
22  there a certain amount of time it has to be delinquent
23  before it qualifies for referral?
24      A.  Yes, depending on the investor.  Usually 60
25  days, but government loans go up to 120 days.

## Page 26

1      Q.  How much for Deutsche Bank, if Deutsche Bank
2  is the investor?
3      A.  Deutsche Bank, we -- our PSA for Deutsche
4  Bank is that we service their loans as we would our
5  own.  So we refer it, we try to refer it no sooner than
6  day 60 of delinquency and no later than day 120, unless
7  there is a reason.  There has to be a reason it's
8  fallen out.
9      Q.  Okay.  When the decision is made to refer a
10  loan to foreclosure -- well, let me strike that.
11      Once the decision is made that it's ripe and all
12  of these conditions are met, then it gets sent to LPS?
13      A.  Yes.
14      Q.  And LPS, in return, refers it to an attorney?
15      A.  An attorney that we have advised them that we
16  want the file sent to, yes.
17      Q.  You have your own stable of preferred
18  attorneys?
19      A.  Yes.
20      Q.  In fact, that's part of your job to manage
21  that network?
22      A.  Yes.
23      Q.  At what point in this process does OneWest
24  start looking for the original note?
25      A.  For an original note in a state like Florida,

## Page 27

1  as soon as the loan is referred to foreclosure because
2  the foreclosure attorney can't do what they need to do
3  without it.
4      Q.  So on the day that it's referred to LPS,
5  OneWest begins the process of getting a hold of the
6  original note?
7      A.  So what happens is it gets referred, and a
8  state like Florida, a loan in Florida goes to a queue.
9  It's also an LPS employee that's on site.  She's on
10  site in Pasadena, Sylvia Carballo.  It goes in her
11  queue and she begins ordering the original documents,
12  wherever they may be.  And she manages that process of
13  receiving the original documents, preparing the bailee
14  letters, getting then sent to the firms, and sending
15  that all to the firms.
16      Q.  At the point that OneWest is referring the
17  loan to LPS for foreclosure, is any kind of
18  representation made to LPS about whether the original
19  note cannot be found?
20      A.  Say that one more time.
21      Q.  Does OneWest tell LPS, when it's referring
22  the case for foreclosure, anything about the status of
23  the original note?
24      A.  No, it's the other way around.  So if Sylvia
25  learns that the original note cannot be found, that the

## Page 28

1  doc custodian does not have record of the original
2  note, or it might be that there was a previous
3  foreclosure and the original note never made it back,
4  she is informed and she logs into a database.
5      Q.  Sylvia is that LPS on-site person?
6      A.  Yes.
7      Q.  And it's on site, but not on your site?
8      A.  She's in Pasadena, right.
9      Q.  OneWest has one main custodian, Deutsche
10  Bank?
11      A.  One bigger -- one of our biggest is Deutsche
12  Bank, yes.
13      Q.  That's where most of One --
14      A.  Yes.
15      Q.  -- West documents are housed?
16      A.  Yes.
17      Q.  And would that be the custodian for any
18  documents where Deutsche Bank and National Trust
19  Company is the investor?
20      A.  Not necessarily.
21      Q.  Is it the most probable custodian?
22      A.  Yes.
23      Q.  When Wells Fargo is the investor, there might
24  be a different custodian?
25      A.  Wells Fargo is a good example.  It could be

**Censor & Associates**
Reporting and Transcription, Inc.

## Page 29

1  at Wells Fargo or it could be at Deutsche Bank.
2      Q.  But what you're telling me, I just want to
3  make sure I understand, what you're telling me today is
4  that a loan where Deutsche Bank National Trust Company
5  is the investor, the custodian may be Deutsche Bank or
6  it may be Wells Fargo or someone else?
7      A.  Yes.
8      Q.  It's Sylvia with LPS who determines which
9  custodian to ask for the document?
10     A.  Based on information she receives from
11 OneWest Bank's computer system, yes.
12     Q.  When we talked last time, you said her name
13 was Sylvia Carballo?
14     A.  Yes.
15     Q.  Her supervisor was Luis Tena?
16     A.  Yes.
17     Q.  You had not --
18     A.  I'm sorry.
19     Q.  That's all right.  You hadn't had much
20 contact with Luis Tena.  I think he had just started
21 then?
22     A.  We are close friends now, yes.
23     Q.  He works in the LPS office, but he's employed
24 by OneWest?
25     A.  No, he works in the LPS office employed by

## Page 30

1  LPS, but supervises the on-sites in Pasadena.
2      Q.  And is that in Minnesota or Florida that he
3  does that?
4      A.  He lives in Jacksonville.  Excuse me.
5  Florida, yes.
6      Q.  And Sylvia is in the Pasadena office?
7      A.  Yes.
8      Q.  Okay.  The way that Sylvia would determine
9  who the custodian was, or what entity is functioning as
10 the custodian, is to look at a computer screen called
11 the MAS1 INV1?
12     A.  That's her beginning point, yes.  That
13 process has actually changed.
14     Q.  Okay.  What's the process today?
15     A.  What we discussed last time is still the
16 underlying, the foundation, but there's a database now
17 that goes out, and based on the loan numbers in her
18 queue, it pulls the original doc, the original document
19 custodian information and the original investor, to try
20 to help her determine faster where the document might
21 be, and it has eliminated some of the errors that we
22 found in the past.
23     Q.  So is it correct to say that that process has
24 been automated somewhat?
25     A.  Yes.

## Page 31

1      Q.  That screen -- and I'm saying it right?  Is
2  it MAS1?  How do you say that?
3      A.  MAS1 INV1.
4      Q.  INV1.  Okay.  It says who the investor is?
5      A.  Yes.
6      Q.  Sylvia, or whoever the specialist is that's
7  doing this job, then e-mails the custodian to ask for
8  the documents, correct?
9      A.  Yes.
10     Q.  And she e-mails you a copy of the list
11 because you have to approve it before the custodian
12 will release the records?
13     A.  That's changed too.
14     Q.  Okay.  What happens now?
15     A.  Now the list has to be approved by treasury.
16 Because of other things outside of the scope of, you
17 know, what's going on here, the doc custodians will now
18 only release them to one person and that person is in
19 treasury.
20     Q.  When you say treasury, you're talking about
21 United States Department of Treasury?
22     A.  No, at OneWest Bank's treasury department.
23     Q.  The what?
24     A.  OneWest Bank's treasury department.
25     Q.  Who is it at the treasury department they

## Page 32

1  release it to?
2      A.  Sandy Schneider.  Well, it's not that they
3  release it to her.  She has to -- she takes over that
4  whole approving it.
5      Q.  Right.  I'm sorry.  So Sandy Schneider --
6      A.  Schneider.
7      Q.  -- approves the release of the original
8  documents?
9      A.  Yes.
10     Q.  The custodians then will pull it from the
11 fireproof vault that it's required to be kept in?
12     A.  I hope so.
13     Q.  And they package it up and mail it to
14 OneWest?
15     A.  They ship it Fed Ex or UPS to Sylvia's
16 attention, and she sits outside of the office of one of
17 the corporate compliance VPs.  There is a room off to
18 the side that has a fireproof cabinet where she stores
19 the documents if she can't get them turned around and
20 out with the bailee letter to the firm via UPS or Fed
21 Ex the same day.
22     Q.  When the custodian ships the original
23 documents, do they ship it in a manner that can be
24 tracked?
25     A.  Yes.

Censor & Associates
Reporting and Transcription, Inc.

9 (Pages 33 to 36)

## Page 33

1  Q. And do you -- you, OneWest -- keep records of
2  that tracking?
3  A. Yes.
4  Q. Do you keep the records even if it's safely
5  made it from the custodian to OneWest?
6  A. Yes.
7  Q. How are those kept?
8  A. In that database I mentioned.
9  Q. So it's a computer record of it?
10  A. Yes.
11  Q. How does that record get into the database?
12  A. Sylvia entered -- well, Sylvia or one of the
13  three people that work with her enters the information
14  in the database.
15  Q. You mentioned that she gets -- wants to turn
16  around and get it out with the bailee letter to the
17  attorneys.
18  A. Yes.
19  Q. I imagine she also sends it in a way that it
20  can be tracked?
21  A. Yes.
22  Q. Is it UPS?
23  A. UPS.
24  Q. Okay. The custodians can choose, use the UPS
25  or Fed Ex; is that right?

## Page 34

1  A. Yes.
2  Q. Whatever they feel like using?
3  A. Yes.
4  Q. But OneWest uses UPS?
5  A. Yes.
6  Q. And you keep the records of that tracking,
7  correct?
8  A. Yes.
9  Q. If the note is not received from the
10  custodian in ten days, then you, OneWest, follows up
11  with the custodian?
12  A. That's been changed.
13  Q. Okay. What's the new rule?
14  A. Seven days. There are three checkpoints back
15  to the doc custodian. So that by day 21, after the doc
16  custodian has not returned it, Sylvia is looking for an
17  e-mail message or something in writing that explains,
18  you know, why can't you find it, where's the note, so
19  that we have better tracking, of not only the follow-up
20  attempts, but what the responses were.
21  Q. Then is there a second follow-up?
22  A. There's three follow-ups: Seven-day, 14-day,
23  and 21-day.
24  Q. What happens after the 21 or 21st day?
25  A. Then we send a request to the custodian to

## Page 35

1  prepare a Lost Note Affidavit.
2  Q. Before the first follow-up, or I should say
3  at the time of the first follow-up, does Sylvia notify
4  anyone else that the document hasn't shown up yet?
5  A. No.
6  Q. When is the first time that the law firm
7  would know that the original documents hadn't arrived
8  at OneWest?
9  A. They would receive an issue through process
10  management to prepare a Lost Note Affidavit. That
11  would be their indication.
12  Q. So that would be on the 21st day?
13  A. Or thereabouts, yes.
14  Q. Is it still true that OneWest isn't satisfied
15  if the custodian just says they couldn't find it; in
16  other words, you want them to come back and tell you
17  why they couldn't find it?
18  A. That's true, yes.
19  Q. You would hope that they would tell you that
20  somebody checked it out and didn't return it?
21  A. Yes.
22  Q. The custodian is required to keep the
23  original documents in a special fireproof locked vault?
24  A. Yes.
25  Q. Is it pretty unusual that the original

## Page 36

1  document doesn't show up?
2  A. Unusual for whom or what? I mean, at what
3  circumstances?
4  Q. Let me rephrase that. Is it unusual for the
5  custodian to report back that they don't have it?
6  A. It happens. Does that answer your question?
7  It's not that it's unusual. It's not like warning
8  bells and whistles go off because the doc custodian
9  couldn't find one. Because it happens with multiple
10  foreclosure filings, with the bankruptcy filing, where
11  an original document, and with the hand-offs and with a
12  bank like OneWest who has several locations, an
13  attorney might get the original document and send it to
14  Pasadena and it should have come to Austin and it sat
15  on someone's desk and no one opened the mail. I mean
16  just, all the things that, you know, that managing a
17  mail system, that happens with managing a mail system.
18  So we try to make changes in our process to eliminate
19  some of the getting the notes back. That's where we
20  have found we have the issue with a lot of our lost
21  notes, is that there was some legal action previous.
22  In some cases we found, after going back two and
23  three times to the doc custodian, that the document was
24  there. It was the doc custodian who just, for whatever
25  reason, whoever they used to pull the document, that

**Censor & Associates**
Reporting and Transcription, Inc.

Page 37

1    person didn't pull the right document and we ended up
2    getting the document. So I don't think it's unusual.
3        One of the things, though, from the last time we
4    spoke till now, I noticed a gap in our procedure. I
5    think we were very aggressive at requesting a Lost Note
6    Affidavit at day ten, seven or ten, and with the
7    volumes happening all over the country, we probably
8    should have taken it out to 21 days a while ago because
9    the notes are there. It just was they hadn't found it
10   by the time we already shot off the request to the
11   firms.
12       Q.   Well, when you say found it, it's not that it
13   was lost, you just hadn't got it transferred from --
14       A.   That's right.
15       Q.   -- the custodian to OneWest, correct?
16       A.   Yes.
17       Q.   I'm still trying to get a sense of how often
18   this happens, though. Is it something that happens
19   every day at OneWest or --
20       A.   No. No, but it happened more as we were
21   going through our transition with the feds taking over
22   and losing a significant amount of staff. Now that we
23   are OneWest Bank, I can't even remember the last time I
24   saw a Lost Note Affidavit, honestly.
25       Q.   Over the last year, let's say, what

Page 38

1    percentage of the loans that you've been involved in
2    started out with being unable to find the original
3    note?
4        A.   What do you mean by involved in?
5        Q.   In your department.
6        A.   I don't know.
7        Q.   Do you have any sense? Is it 1 percent, 5
8    percent, 10 percent?
9        A.   I don't know. There was a time, before we,
10   you know, became less aggressive with our procedure to
11   do the Lost Note Affidavit, assuming that Deutsche Bank
12   couldn't locate it, that I signed Lost Note Affidavits
13   more frequently than I do now. And I think changing
14   the procedure has made a big difference, because, like
15   I said, I can't even remember the last time I signed
16   one. Or it could be now when I get one, I won't sign
17   it until I see that that custodian really can't find
18   it, which is something that I wasn't necessarily doing
19   before unless prompted to do so.
20       So I don't know, out of 77,000 loans in
21   foreclosure, well, then there was probably 60,000 loans
22   in foreclosure, I did several a week, now I can't
23   even remember, I can't remember what that number is,
24   and now I do zero.
25       Q.   Well, you're giving me a total of the loans

Page 39

1    in foreclosure. How many in foreclosure, how many new
2    ones in foreclosure each week?
3        A.   Today?
4        Q.   Yes.
5        A.   It depends on the time of the month because
6    of the investor guidelines with referrals, but I can
7    tell you that overall, across the nation, we referred
8    12,000 loans into foreclosure for the month of June.
9    California is our largest footprint, so 40 percent of
10   those were in California.
11       Q.   Now, some of those you wouldn't know whether
12   they needed a Lost Note Affidavit yet?
13       A.   That's right.
14       Q.   But so far, what your testimony is, is that
15   of the ones that you would know about, none have
16   requested a Lost Note Affidavit?
17       A.   It's been a long while.
18       A.   More than a month?
19       A.   Yes, more than a month.
20       Q.   And it's certainly safe to say that it would
21   be untrue that a 100 percent of the loans that you have
22   in foreclosure had any lost original note?
23       A.   Right, that would be untrue.
24       Q.   The custodian normally has some sort of
25   checkout procedure that people can't just come in and

Page 40

1    take a note, take out a note without signing for it?
2        A.   Yes.
3        Q.   Is there a certain time frame that a
4    foreclosure suit must be filed after the borrower has
5    defaulted?
6        A.   Are you talking about the first legal action
7    in the foreclosure or what --
8        Q.   The filing, the actual filing of the suit, is
9    there a time frame required?
10       A.   See, okay, I'm dealing with 50 states in my
11   mind, so can you get more specific? Are you talking
12   about the first legal action or --
13       Q.   Let's stick with Florida for right now.
14       A.   Okay.
15       Q.   But really the question is directed to your
16   investors and what their guidelines are and what you're
17   required to do. Are you required to get a case filed
18   by 60 days, 120 days after default --
19       A.   I see what you're saying.
20       Q.   -- or you aren't complying with your job?
21       A.   Yes. That's true, yes.
22       Q.   And is that governed by the PSA?
23       A.   Usually, but it's Fannie and Freddie
24   typically that have very strict guidelines about when a
25   file should be in foreclosure and very specific

**Censor & Associates**
Reporting and Transcription, Inc.

## Page 41

1  guidelines for exceptions to that.
2      Q. But when you say in foreclosure, that means
3  the actual filing of the lawsuit?
4      A. It has to be referred, it just has to be
5  referred to foreclosure.
6      Q. Are there any that require actual filing of
7  the lawsuit?
8      A. No.
9      Q. Does OneWest instruct its counsel to file a
10  lost note count regardless of whether the note is
11  actually lost?
12      A. No.
13      Q. It is true that the promissory note in this
14  case was never lost, correct?
15      A. What are we doing?
16      Q. This is Machado.
17      A. No.
18      Q. No, that's not correct?
19      A. It was never lost.
20      Q. Were you aware that on November 21st, 2008,
21  when this case was filed, your attorneys -- by your, I
22  mean, OneWest -- attorneys hired by OneWest --
23      A. Yes.
24      Q. -- in the Machado case represented to the
25  Court that the note had been lost?

## Page 42

1      A. Yes.
2      Q. Let's put these out here in the middle. I
3  had marked previous to your deposition some exhibits.
4  I had them premarked so we could hopefully move a
5  little faster.
6          MR. ICE: Counsel, if you would like to
7      take a look at Exhibit I -- or A, I'm sorry.
8          MR. MANCILLA: Okay.
9  BY MR. ICE:
10      Q. You've been handed what's been marked as
11  Exhibit A to your deposition. Do you recognize that as
12  the complaint in the Machado case?
13      A. Yes.
14      Q. In Count II, in paragraph 16, do you see in
15  the parens there, parentheses --
16      A. Yes.
17      Q. -- it says: Plaintiff does not presently
18  have a copy of the note, but is seeking to obtain a
19  copy, and will file a copy with the Court when
20  obtained?
21      A. Yes.
22      Q. That is not an accurate representation,
23  correct?
24      A. At the time it was. At that time it was.
25      Q. At the time, on November 21st, 2008, OneWest

## Page 43

1  did not have access to the original note?
2          MR. MANCILLA: If you know. If you
3      don't, say you don't.
4          THE WITNESS: I'm trying to separate the
5      cases in my mind. Sorry.
6          MR. MANCILLA: That's all right. Is
7      there anything that you have with you that
8      you could look at?
9          THE WITNESS: No, that's what I was
10      thinking about.
11          I don't, I don't know.
12  BY MR. ICE:
13      Q. Well, you just finished telling me that the
14  note in this case was never lost at all, correct?
15          MR. MANCILLA: She said it wasn't lost.
16          THE WITNESS: It wasn't lost.
17          MR. MANCILLA: Right.
18          THE WITNESS: What I --
19          MR. MANCILLA: Found ultimately.
20          THE WITNESS: Yeah, because what I know
21      is the original note is with the firm today,
22      but --
23  BY MR. ICE:
24      Q. What -- let you finish. I'm sorry.
25      A. But this was back when our procedure was,

## Page 44

1  when it was different. When we would have raised an
2  issue for a lost note at day ten, I believe it was,
3  because we hadn't had a response back from our doc
4  custodian, we were more aggressive then and today we're
5  not. We don't raise that issue, that request until day
6  21.
7      Q. Okay. Do you know if November 21st, 2008 was
8  before or after the response from the custodian?
9      A. We made -- those changes started -- we didn't
10  have the -- the changes weren't confirmed where they
11  were tested and airtight until this year, February of
12  this year. We were still testing the process: What
13  was the right point. Should it be 14 days and then
14  open the issue. Should it be 21 days. Twenty-one days
15  happened to be the magic number. So we were still
16  tweaking the process.
17      Q. Let's step back a little bit because I'm
18  definitely confused. You say that ultimately the note
19  was not lost in this case, correct?
20      A. Right.
21      Q. Did anyone at any time ever believe that the
22  note was lost?
23      A. I don't know.
24          MR. MANCILLA: How could she testify as
25      to anyone, what's in anyone's mind? I mean,

**Ensor & Associates**
Reporting and Transcription, Inc.

12 (Pages 45 to 48)

Page 45

1    I don't understand.
2    BY MR. ICE:
3    Q. Well, you're the vice president of the
4    department of foreclosure at OneWest, correct?
5    A. Yes. I didn't check to see if an issue was
6    raised because you didn't write that in your paper. So
7    I don't know at this moment if an issue was raised for
8    that.
9    Q. Are you aware of any communication to the
10    attorney that the note had been lost?
11    A. No, but -- well, no, I didn't, I didn't look,
12    I didn't look into the loss note aspect for these two
13    files.
14    Q. When plaintiff says in this complaint that
15    they didn't have a copy, that's not true because a copy
16    is on the computer that can be printed out and attached
17    to the complaint, correct?
18    A. Generally, yes. Usually, yes.
19    Q. Take a look at paragraph 18 of the complaint.
20    Do you see the last sentence there, it says: After due
21    and diligent search, plaintiff has been unable to
22    obtain possession of the mortgage note?
23    A. Yes.
24    Q. What due and diligent search was performed in
25    this case?

Page 46

1    A. Excuse me. At that time the due and diligent
2    search would have consisted of an e-mail request to the
3    doc custodian, a time period for which to expect a
4    response back. And at the conclusion of that time
5    period, ten days, I believe -- I'm not sure if it's
6    seven or ten days anymore -- that the assumption was
7    then made that the note could not be found.
8    Q. Okay. So what this is saying, then, is that
9    because it's after the due and diligent search, that
10    means all of that had been completed by the time the
11    attorney filed this on November 21st, 2008?
12    A. Yes.
13    Q. And your testimony is, as of that time, the
14    custodian was reporting that it was lost?
15    A. Can I just look at the time line?
16    Q. Sure.
17    A. I'm sorry. I want to check before I say I
18    don't know. This complaint was filed on November --
19    Q. Twenty-first.
20    A. -- 21st. Well, they breached this loan on
21    September 30th. I have to do the math. Florida is a
22    30-day breach state, so we wouldn't have had it in
23    foreclosure anytime sooner then October 30th. And it's
24    possible, as we still have 21 days of play, and we were
25    too aggressive before with raising the issue to say

Page 47

1    that the note couldn't be found.
2    Q. When was it decided back then, under the
3    rules back then, that the note couldn't be found?
4    A. Just the initial didn't get a response from
5    Deutsche Bank within seven or ten days.
6    Q. You had mentioned the ten days in the last
7    one.
8    A. Is it ten days? Okay. I couldn't remember.
9    Ten days. And as soon as she didn't get response on
10    that tenth day, Sylvia was to raise the issue with the
11    firm. Now, the process management is real time. So if
12    Sylvia raises the issue at 10:00 o'clock, at
13    11:00 o'clock in Florida -- well, she's in Pasadena at
14    10:00. So at 12:00 o'clock in Florida they would have
15    been able to see that the note couldn't be found.
16    Q. Is there a field somewhere in the computer
17    screen where she inputs that there's a problem finding
18    the note?
19    A. The process then -- that process is true
20    today. The process then was she just raised the issue
21    to the firm. And what the issue says is prepare a Lost
22    Note Affidavit. So the assumption is we need to
23    prepare this because we can't locate it.
24    Q. So if I'm understanding your testimony, for
25    this count to be in the complaint, someone would have

Page 48

1    asked, Sylvia would have asked for a Lost Note
2    Affidavit?
3    A. Yes.
4    Q. Okay. Did anyone ask for a Lost Note
5    Affidavit in this case?
6    A. I don't know because I didn't look at that.
7    When I was reviewing the file, I was just looking at
8    the Affidavit of Debt.
9    Q. Where would you go to look for that
10    information?
11    A. In process management.
12    Q. That's the computer program?
13    A. Yes.
14    Q. What screen would you look at?
15    A. I would just pull up the loan number. This
16    is LPS's system. I would just pull up the account by
17    the loan number. And within it there's different
18    modules. There's a foreclosure module. And then each
19    action is broken down by section. So there would be an
20    original doc process, and that's where I would go to
21    see what happened during that process, if it was open
22    and closed.
23    Q. I wasn't sure the court reporter got it.
24    What you said was that this program that you're
25    describing is an LPS system?

**Censor & Associates**
Reporting and Transcription, Inc.

Page 49

1    A. Yes.
2    Q. And is it just a notes field or something in
3    there that someone would type a message, or is it like
4    a yes/no toggle in the computer program?
5    A. How can I -- I'm not a system person, so you
6    have to excuse the way I'm going to describe this.
7    It's kind of like template-based. So you know that in
8    the state of Florida you're going to go through these
9    particular steps, and within these steps there might be
10   sub steps. So in order to go on to the next step,
11   someone has to address the predecessor step. So that
12   means that your yes/no question is accurate, but
13   there's also the capability to put notes. So if you
14   raise an issue you can put notes. There's a whole
15   notes screen. You can send an e-mail from the system
16   which copies back over to the notes, and it's the
17   e-mail between our foreclosure counsel, the client,
18   which would be us, and the LPS reps.
19   Q. I think you described the system as it was
20   back then. What's the difference with how it is now?
21   A. Their system? The LPS's system?
22   Q. Well, the reporting that the custodian was
23   not able to find the note to the law firm.
24   A. The new database, that's ours. That's
25   OneWest Bank's system, yes.

Page 50

1    Q. And what's that system called?
2    A. It's an access database. It's not called
3    anything. It's just an access database that one of my
4    analysts -- it was created by someone else. One of my
5    analysts tweaked it and -- one of the analysts that
6    report directly to me tweaked it so that it's more
7    meaningful and has the controls in place that we
8    needed.
9    So now what it does, like I said, is it takes a
10   lot of the manual-ness out of it. Sylvia doesn't have
11   to go TO MAS1 INV1. The system looks at our, the
12   mainframe -- okay, I'm not a systems person, so, you
13   know -- where all the data is and it's scrubbing, based
14   on the loan number, to pull in who the doc custodian is
15   and then it creates the list. Now, Sylvia doesn't have
16   to create a spreadsheet. It creates a list that is
17   attached to the e-mail that Sandy approves that then
18   goes to the doc custodian to get the documents back.
19   And when the documents come in, there is a, like a
20   gun thing that they hook up to the computer, and so
21   from the bar codes from the Fed Ex or UPS or however
22   the doc, they can scan it and it puts the tracking
23   number on the system. And she does the same thing when
24   she gets ready to send the document out. So now we are
25   keeping track of, we have much better controls over the

Page 51

1    process and better follow-up and follow-through.
2    Q. What does the attorney see of that to know
3    that there's a lost note?
4    A. Today, nothing. What we're working on,
5    however, we're just not quite there yet, is an overlay
6    of the back and forths, or whatever communication
7    Sylvia has to the firms, so that they know how many
8    attempts we made and, you know, ultimately where the
9    document is. And it would probably -- the idea is to
10   upload this into process management, this document into
11   process management.
12   Q. Okay. What I'm understanding from you, then,
13   correct me if I'm wrong, the only time the attorney
14   would know that there's a lost note, either the way the
15   system was then or even the way it is today, is that
16   someone requests a Lost Note Affidavit?
17   A. Yes.
18   Q. Look back at paragraph 4 of the complaint.
19   It says: Plaintiff is now the holder of the mortgage
20   note and mortgage and/or is entitled to enforce the
21   mortgage note and mortgage. Do you see that?
22   A. Yes.
23   Q. Do you know which of those options it is,
24   whether it's they're the holder and entitled to enforce
25   the mortgage note and mortgage, or they're the holder

Page 52

1    or entitled to enforce the mortgage note and mortgage?
2    A. I'm going to read this. Okay.
3    In this case it is, or is entitled to enforce the
4    mortgage note and mortgage.
5    Q. And why do you say that?
6    A. Because Deutsche is the investor and we're
7    servicing, the servicing agent.
8    Q. Right. OneWest is not the holder of the
9    mortgage note and mortgage?
10   A. Right.
11   Q. And even if it was, it couldn't be the holder
12   of the mortgage note because the mortgage note was
13   lost?
14   A. Is that a question?
15   Q. Would you agree with that?
16       MR. MANCILLA: No, the mortgage note
17       wasn't ultimately lost. It may have been
18       missing or it may not have been found at the
19       time the complaint was filed, but it was
20       ultimately found.
21   BY MR. ICE:
22   Q. My question is as of the time that the
23   attorney penned his name onto this complaint and made
24   these allegations to the Court, made factual
25   representations to the Court, as an officer of the

**Censor & Associates**
Reporting and Transcription, Inc.

Page 53

```
1    court, it wasn't holder of the note because it was
2    lost. Would you agree with that?
3         A.  Well, I don't understand that No. 4 to be
4    that, to mean what you are saying.
5         Q.  Okay.  How do you understand it?
6         A.  I understand No. 4 to be the holder, as in
7    who rightfully can enforce the terms, not so much as
8    who physically had the document.  That's just my
9    understanding.
10        Q.  I would tend to agree with you on that.  I
11   think your attorneys might differ with you and
12   certainly differ with me.
13        All right.  You've kind of anticipated my next
14   series of questions, which was, it's true that OneWest
15   does not own the loan in this case?
16        A.  That's true.
17        Q.  Neither OneWest nor IndyMac Federal Bank, FSB
18   nor IndyMac Bank, FSB, none of those entities own the
19   loan in this case?
20        A.  That's right.
21        Q.  The loan has been securitized?
22        A.  Yes.
23        Q.  The loan is owned by a trust?
24        A.  Yes.
25        Q.  The trust is Deutsche Bank National Trust
```

Page 54

```
1    Company?
2         A.  Yes.
3         Q.  I should have said the trustee is Deutsche
4    Bank National Trust Company, correct?
5         A.  Let me just look at that real quick.  Yes.
6         Q.  In your computer systems, the owner of the
7    note is called the investor?
8         A.  Yes.
9         Q.  Your computer systems show that Deutsche Bank
10   National Trust Company is the investor?
11        A.  Yes.
12        Q.  Deutsche Bank National Trust Company is the
13   creditor under the Fair Debt Collection Practices Act?
14        A.  I don't, I don't know.
15        Q.  As your attorney mentioned earlier, I don't
16   want you to guess at anything.  If you don't know,
17   please just say you don't know.  However, if you can
18   estimate something for me and that's relevant, we would
19   like for you to do that.
20        The trust in this case, the Machado case, is the
21   IndyMac INDX Mortgage Trust 2006-AR4, mortgage
22   pass-through certificates series 2006-AR4.
23        A.  Yes.
24        Q.  The PSA that governs the relationship between
25   OneWest and the trustee is dated March 1st, 2006?
```

Page 55

```
1         A.  Yes.
2         Q.  Are there any terms of that particular PSA --
3    and for the benefit of the judge or a jury, whoever may
4    end up reading this, PSA stands for the Pooling and
5    Servicing Agreement?
6         A.  Yes.
7         Q.  Are there any terms of the Pooling and
8    Servicing Agreement that restrict the manner or amount
9    that a loan, that this loan may be modified?
10        A.  I don't know.  I don't know because I didn't
11   read the PSA for this loan.
12        Q.  Do you have it with you today?
13        A.  I don't.  Did you ask me to bring that?
14            MR. MANCILLA:  No.
15   BY MR. ICE:
16        Q.  Please, many times I'll ask you if you have
17   something because I see you have things in front of
18   you.  It's not intended to suggest that you were
19   supposed to bring anything with you.  I'm just, just
20   out of curiosity do you have it?
21        A.  I don't.
22        Q.  Okay.
23        A.  And -- well --
24        Q.  I'm sorry, do you have something to add to
25   your answer?
```

Page 56

```
1         A.  That question is even outside the realm of my
2    responsibility.  Like so in terms of like what's in the
3    PSA agreement, what I'm always looking for is how I can
4    vest and how I can do the action, where the loss mit
5    group is more looking at sections of the PSA that
6    govern what you're speaking to.
7         Q.  Okay.  When you go to look at the Pooling and
8    Servicing Agreement -- well, sorry, strike that.
9         Do you sometimes look at the Pooling and Servicing
10   Agreement as part of your job?
11        A.  Yes.
12        Q.  When you do that, do you pull it up on your
13   system or --
14        A.  Yes.
15        Q.  Do you ever look at what's available on the
16   Internet?
17        A.  No.
18        Q.  Are there any contractual restrictions
19   outside the PSA that you're aware of that restrict the
20   way that this loan may be modified?
21        A.  You mean from a loss mit perspective when you
22   say modify?
23        Q.  Yes.
24        A.  Today, yes.
25        Q.  What contractual provisions are those?
```

**Censor & Associates**
Reporting and Transcription, Inc.

## Page 57

1    A. Obama's HAMP program, and also the FDIC loss
2    mit program, but I'm not the subject matter expert on
3    any of those. I just know that those now govern what
4    and how loans can be modified.
5    Q. Do you have a general idea of what those
6    programs do?
7    A. Yes.
8    Q. Can you take me through the Obama one?
9    A. This is rough, because I've already admitted
10    that's not my area of expertise. So the HAMP program
11    that is administered by Fannie and Freddie, and it's on
12    those two investors that we are required to behave a
13    certain way, but for other investors, other investors
14    can opt in. Of course, the President wants all the
15    loans to be looked at under his plan. And so if there
16    is a -- let me try to get this right.
17    The DTI, debt to income, has to be 31 percent.
18    I'm probably about to get into trouble because I'm
19    trying to go somewhere that I don't know categorically.
20    And if it is and the borrower has, you know, the reason
21    for a default is catastrophic, or it doesn't have to be
22    catastrophic, but, you know, loss of income, divorce,
23    those such things, the borrower is put on a three-month
24    payment plan. The payment may or may not be a full
25    payment. It might be less than a full payment. If the

## Page 58

1    borrower does that for three months, then their loan is
2    modified to a lower interest rate. And there's a range
3    for that lower interest rate, and I don't know exactly
4    what that range is.
5    And in some cases some of the principal balance is
6    not forgiven, but a separate loan is made out of it
7    that the borrower doesn't have to pay unless they sell
8    their home. I'm foggy on that. I'm foggy.
9    The FDIC modification plan I know less about, but
10    it is what Sheila Bair came out with when the FDIC took
11    over IndyMac Federal Bank. It has the same general
12    idea. The borrower has to meet this criteria of debt
13    to income, but the outcome is the same, without the
14    principal reduction.
15    The HAMP program, I'm going back to the other one,
16    also has an area that a borrower doesn't have to be
17    delinquent to qualify for it as long as the borrower
18    can show that they will become delinquent, severely
19    delinquent in the future because they just lost their
20    job yesterday. So they don't have to be delinquent to
21    be approved.
22    Q. Did I understand you correctly to say that to
23    your understanding the Obama program can involve
24    principal reductions, but the FDIC program does not?
25    A. Yes. And you said can. You didn't say

## Page 59

1    always. Possible.
2    Q. It's possible.
3    A. Okay.
4    Q. I think you told me last time Sheila Bair was
5    very much against principal reduction?
6    A. And still is, yes.
7    Q. But she doesn't call the shots at OneWest
8    anymore?
9    A. She does not.
10    Q. When it comes to principal reductions, or a
11    principal reduction in this case, ultimately that would
12    fall to Deutsche Bank to decide whether they want to do
13    that, correct?
14    A. Well, since Deutsche Bank has, and the PSA
15    told us to service this loan diligently as we would our
16    own loans, then they are delegating that authority to
17    OneWest Bank. Today a Deutsche Bank loan would go
18    through an FDIC model. It would not go through a HAMP
19    model because today it's just the Fannies and Freddies
20    that are requiring that it is happening on. That will
21    change. It's just they're not there yet.
22    Q. So it's safe to say that today OneWest is not
23    doing any modifications that involve principal
24    reductions?
25    A. I didn't say that.

## Page 60

1    Q. Well, that's why I asked.
2    A. I have seen loans in the HAMP program where
3    borrowers have received -- or they were offered. I
4    don't know if one actually accepted, accepts the plan,
5    but they were offered one that had the principal. And
6    it's not really a principal forgiveness. It's there.
7    It's kind of just the borrower is making a payment, of
8    course, on a less, you know, their payment is much --
9    is greatly reduced because that piece of the principal
10    balance, that's not necessarily forgiven. It's kind of
11    just moved into the shadows.
12    Q. It's capitalized into the loan?
13    A. No, it's not even capitalized into the loan.
14    It's like a second loan. And if the borrower ever pays
15    their loan off, they have to pay back that money, but
16    if they're just going to live in the house forever,
17    they would always be making that lower payment. That's
18    my understanding. That's my loose understanding.
19    Q. Is that an option for any loan owned by
20    Deutsche Bank?
21    A. Today, no, but it could change tomorrow. I'm
22    going into unchartered waters again. When Obama came
23    out with this plan, the HAMP plan, it was required that
24    any Fannie and Freddie investor loan, it had to abide
25    by these rules. It has taken time for the other

**ensor & Associates**
Reporting and Transcription, Inc.

## Page 61

1    investors to be a part of the required.
2        OneWest Bank wants to help the borrowers stay in
3    their home. Obviously, you know, OneWest Bank is not
4    in the business of taking homes back. But we do have
5    some investors, and I can say this because of some of
6    the mediations I've gone where Deutsche Bank has been
7    the investor, where the loan can't go through the HAMP
8    plan, it has to go through the FDIC plan, which still
9    does not approve principal reductions.
10       The meeting that I was in yesterday morning is
11   that we are close to getting to a point where all the
12   investors will be included in the HAMP plan, but I
13   don't manage that process and I don't have any say-so.
14   I'm just waiting.
15       Q.  And the loss mit department is a separate
16   department from yours?
17       A.  Yes.
18       Q.  However, you would become aware of a
19   successful loss mit program or plan --
20       A.  Yes.
21       Q.  -- because it's no longer in foreclosure; is
22   that right?
23       A.  Yes.
24       Q.  And you have personally attended mediations
25   at which loan modifications were entered into?

## Page 62

1        A.  Well, not entered into, but discussed.  You
2    know, when we go to a mediation in Florida, the
3    required mediation, the mediator, of course, wants to
4    know what it is we can do.  We come with everything
5    that it is we can do.  So I know that Deutsche Bank,
6    because of one of these mediations, those loans are
7    still going through the FDIC model.
8        Q.  And the way you described it before, is that
9    something that Deutsche Bank can sort of opt into and
10   say, I want to do the Obama program?
11       A.  Deutsche Bank could, yes, Deutsche Bank
12   could, any investor can do that and we would follow
13   suit.  We do have some investors, for example, Lehman,
14   we have a group of their loans that they service that
15   they want us to treat their loans through the HAMP
16   program.
17       Q.  Do you know how OneWest gets paid for the
18   service of servicing the loans for Deutsche Bank?
19       A.  No.
20       Q.  You don't know if it's a percentage of the
21   pool or anything like that?
22       A.  No.
23       Q.  Who would know that at OneWest?
24       A.  Someone in secondary marketing.
25       Q.  Do you have a name?

## Page 63

1        A.  I want to say Aaron Wade, but I'm not sure if
2    he's there anymore.  It's in Pasadena.  I'm too busy
3    with all my foreclosures and bankruptcies.
4        MR. ICE:  I don't know if you, I'm about
5    to move to another exhibit, I don't know if
6    anybody wants to take a break?
7        MR. MANCILLA:  I'm all right.
8        THE WITNESS:  I'm okay.
9        MR. ICE:  Keep going.
10   BY MR. ICE:
11       Q.  Okay.  Take a look at Exhibit B to your
12   deposition.  Do you recognize that document?
13       A.  Yes.
14       Q.  What is it?
15       A.  It is the Affidavit of Debt in the Machado
16   loan, on the Machado loan.
17       Q.  Is that your signature on the final page?
18   When I say final, there's a service list that's
19   attached to my copy, but the final page of the
20   affidavit?
21       A.  Yes.
22       Q.  And that's the long form signature?
23       A.  Yes.
24       Q.  The old way you signed your name?
25       A.  Yes.

## Page 64

1        Q.  Do you still use this old form of signature
2    for anything?
3        A.  No.
4        Q.  Okay.  Do you know who prepared this
5    affidavit?
6        A.  Someone at the firm.
7        Q.  The law firm?
8        A.  The law firm, yes.
9        Q.  In this case it would be Florida Default?
10       A.  Yes.
11       Q.  How do you know that?
12       A.  Because I'm sitting here with Joe and I know
13   I didn't transfer a file in the middle of a
14   foreclosure.
15       Q.  Okay.  And you see down at the bottom the
16   file number --
17       A.  Yes.
18       Q.  -- and the doc ID number?
19       Are you familiar enough with these documents to
20   recognize that as a Florida Default doc number, a file
21   number?
22       A.  No.
23       Q.  You don't know one way or the other?
24       A.  No.
25       Q.  Do you know why the numbers are treated there

**Censor & Associates**
Reporting and Transcription, Inc.

Page 65

1   in big, bold letters with the asterisks?
2       A.  No.
3       Q.  Is that some sort of computer scanning
4   process?
5       A.  I have no idea, because when I get it, it
6   doesn't have that on it.  Oh, yes it does.  Yes, it
7   does.  I'm sorry.  Sorry.
8       Q.  In paragraph 1 -- well, before I go into the
9   specifics, again, I know we covered some of this when
10  we were talking about Lost Note Affidavits and things
11  like that, but just to be clear, the process here is
12  the firm, the law firm, perhaps the affidavit, correct?
13      A.  Based on data that was provided to them from
14  our system of record.
15      Q.  Right.  And they have access to the computer
16  screens to fill in the numbers in the affidavit?
17      A.  Well, we actually give them copies of
18  computer screens, yes.
19      Q.  So they don't have -- they can't just log on
20  and see the same computer screens?
21      A.  No, they can't.
22      Q.  The numbers that are on the computer screen
23  come from where?
24      A.  Okay.  So when the file -- when the attorney
25  is about to do this part in the process, LPS will

Page 66

1   upload certain screen prints that we've already --
2       (Thereupon, there was a brief pause in
3   the proceedings, beginning 2:26 p.m, resuming
4   at 2:48 p.m.)
5       (Thereupon, the designated answer was
6   read back by the Reporter.)
7       THE WITNESS: -- have told them need to
8   go with each packet every time a firm is
9   getting ready to do an Affidavit of Debt.
10  And then it's from those screen prints that
11  the firm can fill in the accurate
12  information, the accurate information.
13  BY MR. ICE:
14      Q.  So the screen prints aren't physically sent
15  to them, they're just on another system that they can
16  pull up the image?
17      A.  Both.  Well, I don't know.  Actually, I don't
18  know.  You definitely -- they definitely can pull up
19  the image, because when I was preparing for the case, I
20  copied the images and -- but I'm -- that makes the most
21  sense.  I'm sure they're not printing the things off
22  the system and mailing them.
23      Q.  Okay.  The numbers that are on those screen
24  prints are both calculated numbers and input numbers,
25  correct?

Page 67

1       A.  What are we talking about?
2       Q.  Well, I was trying to talk about all of them.
3       A.  The numbers usually come straight off of the
4   screen print, so they're not -- can we take one for an
5   example?
6       Q.  Yes.
7       A.  Which one do you want to take?
8       Q.  Principal.
9       A.  So that's an easy one.  That's just coming
10  straight off from the system and there's no calculation
11  involved.
12      Q.  Well, that's not original principal.  That's
13  principal still owing, correct?
14      A.  Right.
15      Q.  So at some point the computer has to subtract
16  whatever payments have been made?
17      A.  Oh, see, that's what you meant.  Okay.  When
18  you log onto the system and look at this loan, just at
19  a general information screen, what you will see is the
20  unpaid principal balance.  So the user doesn't have to
21  calculate anything, it's there.
22      Q.  Okay.  Someone originally had to put in the
23  amount of the original principal balance, the original
24  principal of the loan, correct?
25      A.  When the loan boarded?

Page 68

1       Q.  Yes.
2       A.  Yes.
3       Q.  And by boarded, I assume you meant it was put
4   into the system because it became part of OneWest's
5   servicing responsibility?
6       A.  Yes.  And I don't know that someone manually
7   did it.  I believe that happens by tape.
8       Q.  How does the information get onto the tape?
9       A.  I believe, this isn't my area of expertise, I
10  believe that if we're purchasing a loan, the
11  information is provided to us by tape from the seller
12  and then uploaded automatically into our computer
13  system.
14      Q.  Okay.  The original lender in this case was
15  IndyMac, correct?
16      A.  I think.  Let me just make sure.  Have to
17  look at my papers.  Because one of these we bought from
18  Aegis.  Yes, the original is IndyMac, yes.
19      Q.  So in this case, somebody from IndyMac, who's
20  now OneWest, would have at some point input --
21      A.  Yes.
22      Q.  -- the information physically into the
23  computer?
24      A.  Yes, that's true.
25      Q.  And we don't know who that was now?

## Page 69

1    A.  No.
2    Q.  Then the computer is programmed to, as
3 payments are made and logged into the computer, to
4 deduct principal --
5    A.  Yes.
6    Q.  -- from the original principal?
7    A.  Yes.
8    Q.  Which requires someone else to physically
9 type in when a payment is made, correct?
10    A.  Yes.
11    Q.  Are there any, like if it's an electronic
12 payment or something, does it go automatically into the
13 computer from the bank where the borrower is paying
14 from?
15    A.  I believe so.
16    Q.  The interest rate, again the -- or the
17 interest per diem that's calculated, the number here of
18 $16,088.21, is computed from the original terms of the
19 loan, correct?
20    A.  Well, the interest would be, in that
21 equation, it would be the unpaid principal balance, not
22 the original principal balance.
23    Q.  Right. But at some point, someone had to put
24 in what the rate was going to be?
25    A.  Yes.

## Page 70

1    Q.  And then the computer does the rest --
2    A.  Yes.
3    Q.  -- and calculates what that represents?
4    A.  Initially, or are we talking about if we were
5 to look at this today?
6    Q.  Right now I'm just asking about how these
7 numbers got onto this affidavit.
8    A.  So we have a workstation within our system of
9 record that generates payoff statements. That's the
10 information that we provide to the firms because we can
11 put in an as-of date, and then the system, yes, based
12 on the interest rates that are already cataloged in the
13 system for prior months and future months will do the
14 calculations.
15    Q.  Because there's a time lag to get these into
16 the affidavit and for you to sign it, the computer
17 system is actually projecting ahead a little bit as to
18 how much interest is going to be due and owing on a
19 date in the future?
20    A.  It depends. Let's see. On this one, the
21 interest is, as of 2/9, 2009, so, yes, it was projected
22 out. And as long as the interest rate is available,
23 meaning it's not an adjustable, a monthly adjustable
24 interest rate, then it will do that accurately. There
25 are times when the system can be off if the interest

## Page 71

1 rate is not available, depending on when this request
2 is made, and then what the system is going to do is use
3 the interest rate it has available to calculate.
4    Q.  And that's because the adjustables are
5 sometimes tied to rates that you can't possibly project
6 into the future?
7    A.  Right. Right, once the U.S. Treasury
8 publishes them, then --
9    Q.  Okay. So based on the screen print, someone
10 at the firm puts these numbers in and then they
11 transfer this to LPS or back to OneWest, or, pardon me,
12 I think you said it's uploaded to the computer?
13    A.  It's uploaded back, because the document has
14 to be signed, it now goes through its -- and I don't
15 know what kind of QC process it goes through on the
16 firm side, so just speaking from what I know, the firm
17 would upload it back through LPS's system for the
18 document to get signed.
19    Q.  And it gets printed out in Austin for you to
20 sign?
21    A.  It gets printed in Minnesota --
22    Q.  Okay. You said that.
23    A.  -- and gets shipped to Austin.
24    Q.  And at that point you sign this without any
25 kind of your personal verification that any of these

## Page 72

1 numbers are correct?
2    A.  There will be a sticky on it, on this. And
3 what I have is okay to sign by the foreclosure
4 specialist that owns this digit. And based on that, I
5 won't double check the numbers.
6    Q.  Do you ever double check any of the numbers?
7    A.  No, because our QC process that used to be a
8 100 percent that's now 10 percent, it has really zero
9 level of error because the numbers are really coming
10 right off of -- no one's manually doing this. So I
11 just look for that sticky so that I know that the
12 person I charged with checking it is doing what I'm
13 expecting them to do.
14    Q.  So when the firm prepares this, is this
15 somehow drawing from the bank's computer system to put
16 these numbers in here or is there a paralegal somewhere
17 and typing these in?
18    A.  I don't know. I don't know, which is why I
19 have a specialist double check to make sure. I mean,
20 they're to look at this and say, if I was doing this
21 all from the beginning, would I come up with the same
22 number. That's why we have that double check.
23    But I don't want to represent that errors aren't
24 made and errors aren't caught and we don't take losses
25 because of errors.

Censor & Associates
Reporting and Transcription, Inc.

## Page 73

1    Q. Do you know whether this was prepared during
2  the 100 percent QC phase or the 10 percent QC phase?
3    A. This would have -- the 100 percent QC phase.
4    Q. So someone at OneWest would have checked
5  these numbers before giving them to you?
6    A. Yes. Let me backtrack, make sure that I was
7  clear. A 100 percent of the time someone has to double
8  check these numbers before I sign.
9    Q. Right.
10    A. We have a QC process on top of that, that
11  they were QCing how many times we had to reject the
12  document because the numbers were incorrect. That
13  process has gone from a 100 percent to 10 percent, but
14  a 100 percent of the time a specialist looks at these
15  numbers before I sign.
16    Q. Okay. But both back then and today, the
17  numbers, OneWest checks every single number every
18  single time?
19    A. Back then and, yes, today.
20    Q. However, you're not the one doing that?
21    A. No. As the vice president of the department,
22  no, I don't. I have employees that report to me that
23  do that.
24    Q. Right. And do you have any way of knowing
25  who did it on this document?

## Page 74

1    A. I don't.
2    Q. In the first line you say: This affidavit is
3  submitted in support of Plaintiff's Motion for Final
4  Judgment for the purpose of showing: That there is no
5  genuine issue as to any material fact, that plaintiff
6  is entitled to enforce the note and mortgage and
7  plaintiff is entitled to a judgment as a matter of law.
8  Do you see that?
9    A. Yes.
10    Q. Is there anywhere in the affidavit where you
11  actually declare that OneWest -- the basis for OneWest
12  being entitled to enforce the note and mortgage?
13    A. I'm sorry, what now?
14    Q. In other words, the way I read it, that's
15  sort of an introductory paragraph as to why this is
16  being filed.
17    A. Okay.
18    Q. So my question is, do you say anywhere in
19  here as to what the basis is for plaintiff, which is
20  IndyMac Federal Bank, FSB, being entitled to enforce
21  the note and mortgage?
22    A. Being entitled to enforce. I'm looking for
23  the sentence that says -- if you say No. 1 is an
24  introductory paragraph, then I don't see a statement
25  that categorically refers back to the fact that OneWest

## Page 75

1  can enforce the note, but I'm not reading it like an
2  introductory paragraph because it's numbered.
3    Q. Okay. Yeah, you don't have to adopt my
4  interpretation of it.
5    A. So, no.
6    Q. The question is, regardless, viewing the
7  document as a whole, any paragraph, where do you give
8  the basis that the plaintiff is entitled to enforce the
9  note and mortgage?
10    A. It's not given in this particular affidavit.
11    Q. Even though it says that that's the reason
12  that this is being given?
13    A. It's in support of our motion, the motion,
14  yes.
15    Q. Right. At the time this was signed, IndyMac
16  Bank was the servicer -- IndyMac -- strike that.
17    Who -- what company was -- the plaintiff is
18  IndyMac Federal Bank, FSB, correct?
19    A. Yes.
20    Q. But your affidavit is talking about IndyMac
21  Bank as servicer of the loan. Would that be incorrect,
22  in paragraph 2?
23    A. I don't know that that -- I think that's an
24  interpretation of whether that is necessarily incorrect
25  because it doesn't -- the plaintiff says IndyMac

## Page 76

1  Federal Bank. I signed in the capacity as IndyMac
2  Federal Bank in No. 5, so I think paragraph 2 doesn't
3  go to the validity of the document. I think it's an
4  error. What do you call those? Scribner error.
5    Q. Right. It should be IndyMac Federal Bank,
6  correct?
7    A. I would like to have seen it be IndyMac
8  Federal Bank, yes.
9    Q. Because when we started this whole
10  deposition, you agreed with me that IndyMac Bank ceased
11  to exist in July of last year.
12    A. Yes, but the plaintiff is IndyMac Federal
13  Bank on the document.
14    Q. Right. So as of December 15th, 2008, when
15  you signed it, IndyMac Bank wasn't the servicer of the
16  loan. They didn't even exist; is that correct?
17    A. That's right.
18    Q. Is that something that your QC people look
19  for?
20    A. It is my understanding that it is a QC point
21  for Fidelity -- LPS, yes.
22    Q. Going on in paragraph 2, it says that you are
23  familiar with the books of account. What are books of
24  account?
25    A. The system records.

**Censor & Associates**
Reporting and Transcription, Inc.

Page 77

1   Q. So what you're talking about is the computer
2   programs that we have been discussing?
3   A. Yes.
4   Q. It says that you have examined all the books,
5   records, and documents kept at IndyMac Bank, FSB
6   concerning the transactions alleged in the complaint,
7   correct?
8   A. Yes.
9   Q. Again, IndyMac Bank didn't have any books,
10   records, or documents at that time, correct?
11   A. Correct.
12   Q. Secondly, you didn't examine anything? It
13   was somewhere else?
14   A. Someone that reports to me, yes.
15   Q. When you say, say, all the transactions alleged in
16   the complaint, when you signed this, did you know what
17   transactions were alleged in the complaint?
18   A. I know when I sign an Affidavit to Amounts
19   Due and Owing what I'm signing, so. And I'm signing
20   that as of the date that this is referring to, that is
21   what the borrower owed.
22   Q. Did you have a copy of the complaint there to
23   review to know what transactions were being alleged in
24   the complaint?
25   A. I don't need to have -- no, I didn't.

Page 78

1   Q. Do you know whether or not it had a lost note
2   count in it at the time you signed this?
3   A. No.
4   Q. Continuing on in paragraph 2: All of these
5   books, records, and documents are kept by IndyMac Bank,
6   FSB in the regular course of its business as servicer
7   of the loan transaction and are made at or near the
8   time by, and from information transmitted by, persons
9   with personal knowledge of the facts such as your
10   affiant.
11   What personal knowledge do you have that the books
12   and records and documents that are kept by, should be
13   IndyMac Federal Bank at that time, are in the regular
14   course of its business?
15   A. Because as a servicer and as a bank, the
16   records are customary. The financial records are
17   customary. Did I get that -- maybe I didn't understand
18   the question. Let me read it.
19   Yes, as a bank and as a servicer, it is customary
20   to keep financial records and customer logs and copies
21   of documents.
22   Q. How did you confirm that the records that you
23   were looking at were made at or near the time by, and
24   from information transmitted by, persons with personal
25   knowledge?

Page 79

1   A. My staff, when they check the figures,
2   they're going to do it based on the effective dates
3   shown here as a check and balance that as of that time,
4   as of, in this case, February 9th, 2009, that's what
5   the principal balance was and that's what the interest
6   rate was.
7   Q. Well, I'm focused on the idea that the
8   entries into this computer system you say are made by,
9   or from information transmitted by, persons with
10   personal knowledge of the facts. You know, we've
11   already talked about some of the entries, some of the
12   data comes from tape. Do you know in this particular
13   case, did this come from tape or somebody who typed it
14   into the computer?
15   A. I don't know.
16   Q. You don't know -- because you don't know
17   that, you don't know whether it was made at or near the
18   time that the records came to be, right?
19   A. I do know that working for a bank we are
20   strongly regulated and that this is the normal course
21   of business, and because of reg A and B and other regs,
22   we wouldn't, as a business, OneWest Bank wouldn't
23   represent that we're doing these things if it weren't
24   happening in the normal course of business.
25   Q. Well, IndyMac was the original lender,

Page 80

1   correct?
2   A. Yes.
3   Q. But it was probably done through some sort of
4   a mortgage broker?
5   A. Yes.
6   Q. Do you have any way of knowing today who that
7   was?
8   A. I looked at that. I don't know if I brought
9   it with me. I can't remember. It wasn't a name that's
10   standing out for me, either. I didn't print it. I
11   don't know for sure.
12   Q. So sitting here today, you don't know who
13   that was that sat down with my client and signed the
14   loan?
15   A. Well, let me just double check. I don't
16   know.
17   Q. I presume there would have been an
18   underwriter at IndyMac who would have approved what the
19   mortgage broker was doing?
20   A. That's not my area of expertise. I'm not
21   sure what the requirements are when they -- I don't
22   know. I don't know.
23   Q. Okay. Among the folks I've talked about so
24   far, the mortgage broker, whoever at IndyMac was
25   overseeing that process, did any of them, were any of

**Censor & Associates**
Reporting and Transcription, Inc.

## Page 81

1  them the people who put the information into the
2  computer?
3      A.  It's possible.  Probably not the mortgage
4  broker.  My best guess is it would have been an IndyMac
5  Bank employee.
6      Q.  And would that have been based on the
7  documents that were physically signed and physically
8  delivered to IndyMac?
9      A.  That would be my understanding, but, again,
10  that's -- I don't know the front end.
11      Q.  And when that was done, whether it was close
12  to the time of the loan or a long time from the time of
13  the loan, you would have no personal knowledge of,
14  correct?
15      A.  No.  I mean, personal knowledge in this case
16  of when, how, or when the documents were uploaded?
17      Q.  Right.
18      A.  No, I don't.
19      Q.  You have no personal knowledge of that?
20      A.  I have no personal knowledge.
21      Q.  In paragraph 4 you say: Plaintiff, IndyMac
22  Federal Bank, FSB, is owed the following sums of money.
23      A.  Um-um.  Yes.
24      Q.  The truth is, is that that money was owed to
25  Deutsche Bank, correct?

## Page 82

1      A.  I guess it depends on how you interpret that
2  word "owed."  As the servicing agent for Deutsche Bank,
3  OneWest Bank would be collecting the funds.
4      Q.  For Deutsche Bank?
5      A.  To pass through to Deutsche Bank.
6      Q.  And it's really the same for this foreclosure
7  action, too.  IndyMac is the plaintiff, but if you win
8  this lawsuit, it's Deutsche Bank that collects the
9  proceeds or the house at the end of the day, correct?
10      A.  Yes.
11      Q.  Okay.  Let's just see what's been marked as
12  Exhibit C to your deposition, ask you if you recognize
13  that document?
14      A.  Yes.
15      Q.  What is it?
16      A.  The responses to the interrogatories.
17      Q.  Do you recognize the signature on that
18  document?
19      A.  That's my new signature.
20      Q.  The new and improved?
21          MR. MANCILLA:  The new and shortened,
22      anyway.
23  BY MR. ICE:
24      Q.  Are those the only two signatures that you
25  use?

## Page 83

1      A.  Yes.
2      Q.  And this is the one you use from now on on
3  everything?
4      A.  Yes, except for my checkbook.
5      Q.  And on these interrogatories you signed as
6  attorney-in-fact.  Do you see that?
7      A.  Yes.
8      Q.  Who are you the attorney-in-fact for?
9      A.  IndyMac Federal Bank.
10      Q.  Why did you not sign as the vice president of
11  IndyMac Federal Bank?
12      A.  At the time that I signed this -- does that
13  say May 29th, 2009?
14      Q.  I think so.
15      A.  As of March 19th, I could only do
16  attorney-in-fact for IndyMac, IndyMac Federal, and FDIC
17  as receiver, and FDIC as conservator.
18      Q.  But at that time it had already become
19  OneWest, correct?
20      A.  Yes, but since the action -- yes.  But since
21  the action, the plaintiff in the action was IndyMac
22  Federal, I can still sign for IndyMac Federal as
23  attorney-in-fact until 2010.
24      Q.  Who granted you the power of attorney to sign
25  for a nonexistent entity?

## Page 84

1      A.  FDIC.
2      Q.  Do you have that power of attorney with you?
3      A.  I do.  I brought it just for you.
4      Q.  Thank you.
5      A.  Hold on.  I'm trying to make sure I give you
6  the right one.  Hold on.  I'm sorry.
7          THE WITNESS:  Are we going to break
8      right now?
9          MR. MANCILLA:  Yes.
10          MR. ICE:  Okay.
11          (Thereupon, there was a brief pause in
12      the proceedings, beginning at 2:59 p.m.,
13      resuming at 3:14 p.m.)
14          (Continued at Volume II)

Censor & Associates
Reporting and Transcription, Inc.

| A | | | | |
|---|---|---|---|---|
| **Aaron** 63:1 | **aesthetically** 22:23 | **and/or** 51:20 | **attached** 45:16 50:17 63:19 | 79:21 |
| **abide** 60:24 | **affiant** 78:10 | **answer** 9:4 36:6 55:25 66:5 | **attempts** 34:20 51:8 | **back** 9:24 16:17 17:13 22:11 |
| **able** 47:15 49:23 | **affidavit** 13:6 14:18 15:20,22 | **anticipated** 53:13 | **attended** 61:24 | 23:11 25:9 28:3 34:14 |
| **accepted** 60:4 | 20:17 35:1,10 | **Antoinette** 4:13 | **attention** 15:8 32:16 | 35:16 36:5,19 |
| **accepts** 60:4 | 37:6,24 38:11 | **anybody** 63:6 | **attorney** 9:7 | 36:22 43:25 |
| **access** 23:24 24:1,4 43:1 | 39:12,16 47:22 48:2,5,8 51:16 | **anymore** 46:6 59:8 63:2 | 25:18 26:14,15 27:2 36:13 | 44:3,17 46:4 47:2,3 49:16 |
| 50:2,3 65:15 | 63:15,20 64:5 | **anyone's** 44:25 | 45:10 46:11 | 49:20 50:18 |
| **account** 1:11 48:16 76:23,24 | 65:12,16 66:9 70:7,16 74:2 | **anytime** 46:23 | 51:2,13 52:23 54:15 65:24 | 51:6,18 58:15 60:15 61:4 |
| **accuracy** 14:25 | 74:10 75:10,20 | **anyway** 82:22 | 83:24 84:2 | 66:6 71:11,13 |
| **accurate** 15:13 23:12 42:22 | 77:18 | **apart** 21:22 | **attorneys** 16:5 | 71:17 73:16,19 |
| 49:12 66:11,12 | **affidavits** 13:4 14:2,3 15:5 | **APPEARAN...** 2:1 | 26:18 33:17 41:21,22 53:11 | 74:25 |
| **accurately** 70:24 | 23:21 38:12 65:10 | **appropriate** 23:2 | **attorney-in-fact** 7:7,8,9 83:6,8 | **backtrack** 73:6 **bailee** 27:13 |
| **acknowledgm...** 20:13 | **afternoon** 9:2 | **approval** 9:21 9:23,24 | 83:16,23 | 32:20 33:16 |
| **act** 23:4 54:13 | **agent** 52:7 82:2 | **approve** 31:11 61:9 | **auditors** 9:21 | **Bair** 58:10 59:4 |
| **action** 36:21 40:6,12 48:19 | **aggressive** 37:5 38:10 44:4 | **approved** 12:11 31:15 58:21 | **Austin** 4:16 16:21,23 17:4 | **baked** 10:24 **balance** 58:5 |
| 56:4 82:7 83:20,21,21 | 46:25 | 80:18 | 36:14 71:19,23 | 60:10 67:20,23 69:21,22 79:3 |
| **actual** 17:7 40:8 41:3,6 | **ago** 37:8 | **approves** 32:7 50:17 | **authority** 6:8,14 7:3,4 8:16 12:6 | 79:5 |
| **add** 55:24 | **agree** 6:2 12:5 52:15 53:2,10 | **approving** 32:4 | 12:15 59:16 | **balances** 16:14 |
| **addition** 12:13 | **agreed** 76:10 | **area** 57:10 58:16 | **authorized** 21:9 | **bank** 1:4 4:18 4:20,23 5:1,3,8 |
| **address** 4:14 49:11 | **agreement** 55:5 55:8 56:3,8,10 | 68:9 80:20 | 21:17 | 5:13,14,18,21 |
| **adjustable** 70:23,23 | **ahead** 70:17 | **arrive** 17:2 | **automated** 30:24 | 6:18,18,19,20 6:20,20,22,24 |
| **adjustables** 71:4 | **airtight** 44:11 | **arrived** 35:7 | **automatically** 68:12 69:12 | 6:25,25 7:6,8,9 |
| **administered** 57:11 | **ALIVE** 1:9 | **asked** 48:1,1 60:1 | **available** 17:15 | 10:11 11:8 |
| **admitted** 57:9 | **allegations** 52:24 | **asking** 8:21 70:6 | 56:15 70:22 71:1,3 | 12:4 16:18,22 19:1 25:6 26:1 |
| **adopt** 75:3 | **alleged** 77:6,15 77:17,23 | **aspect** 45:12 | **average** 13:12 13:12 | 26:1,3,4 28:10 28:12,18 29:1 |
| **adopted** 8:25 9:1 | **alternative** 12:18,20 | **assets** 5:17 **Assignments** 14:7 | **AW** 1:3 | 29:4,5 36:12 37:23 38:11 |
| **advance** 9:22 | **amount** 8:18,19 8:22 25:22 | **Associates** 1:23 | **aware** 41:20 45:9 56:19 | 47:5 53:17,18 53:25 54:4,9 |
| **advances** 9:20 10:2 | 37:22 55:8 67:23 | **assume** 68:3 **assuming** 38:11 | 61:18 | 54:12 58:11 59:12,14,17,17 |
| **advised** 26:15 | **Amounts** 77:18 | **assumption** 46:6 47:22 | B | 60:20 61:2,3,6 62:5,9,11,11 |
| **Aegis** 68:18 | **analysts** 50:4,5 50:5 | **asterisks** 65:1 **as-of** 70:11 | **B** 3:11 63:11 | 62:18 69:13 |

| | | | | |
|---|---|---|---|---|
| 74:20 75:16,18 | bigger 28:11 | C 82:12 | 74:25 | **CLAIMANTS** |
| 75:21 76:1,2,5 | biggest 28:11 | CA 1:3 | caught 72:24 | 1:10 |
| 76:8,10,13,15 | bill 9:24 | cabinet 32:18 | ceased 5:8 76:10 | **CLAIMING** 1:7 |
| 77:5,9 78:5,13 | bit 18:23 44:17 | calculate 67:21 | certain 8:18 | clear 15:2 65:11 |
| 78:15,19 79:19 | 70:17 | 71:3 | 25:22 40:3 | 73:7 |
| 79:22 81:5,22 | blank 16:2 | calculated 66:24 | 57:13 66:1 | client 22:19,22 |
| 81:25 82:2,3,4 | boarded 67:25 | 69:17 | certainly 39:20 | 49:17 80:13 |
| 82:5,8 83:9,11 | 68:3 | calculates 70:3 | 53:12 | clients 22:18 |
| **bankruptcies** | bold 65:1 | calculation | **CERTIFICA...** | client's 24:1 |
| 63:3 | books 76:23,23 | 67:10 | 3:5,6,8 | close 29:22 |
| bankruptcy 5:4 | 77:4,9 78:5,11 | calculations | certificates | 61:11 81:11 |
| 9:10 14:8 15:6 | borrower 25:7,8 | 70:14 | 54:22 | closed 48:22 |
| 16:3 36:10 | 25:10 40:4 | California 11:2 | change 59:21 | codes 50:21 |
| **bankruptcy-r...** | 57:20,23 58:1 | 39:9,10 | 60:21 | collecting 82:3 |
| 12:17 | 58:7,12,16,17 | call 25:8,9,10 | changed 5:5 | **Collection** 54:13 |
| bank's 29:11 | 60:7,14 69:13 | 59:7 76:4 | 7:24 14:11 | collects 82:8 |
| 31:22,24 49:25 | 77:21 | called 4:6 30:10 | 18:22 30:13 | come 13:6 35:16 |
| 72:15 | borrowers 60:3 | 50:1,2 54:7 | 31:13 34:12 | 36:14 39:25 |
| bar 50:21 | 61:2 | capability 49:13 | changes 9:12 | 50:19 62:4 |
| **Barns** 24:8 | boss 13:5 21:13 | capacity 76:1 | 36:18 44:9,10 | 65:23 67:3 |
| based 16:15 | boss's 21:10 | capitalized | changing 38:13 | 72:21 79:13 |
| 29:10 30:17 | bottom 25:20 | 60:12,13 | charge 8:5,13 | comes 25:19 |
| 50:13 65:13 | 64:15 | Carballo 27:10 | charged 72:12 | 59:10 79:12 |
| 70:11 71:9 | bought 68:17 | 29:13 | check 14:25 | coming 18:25 |
| 72:4 79:2 81:6 | **Boulevard** 1:19 | carnantions 5:6 | 15:2,3 16:25 | 67:9 72:9 |
| basically 16:23 | 1:24 | case 1:3 5:20,23 | 22:24 23:1,20 | committee 8:23 |
| basis 74:11,19 | breach 9:11,12 | 5:25 6:3,3 8:17 | 23:22 45:5 | communicate |
| 75:8 | 46:22 | 11:10 24:22 | 46:17 72:5,6 | 15:25 |
| **Beach** 1:2,19,20 | breached 46:20 | 25:9,14 27:22 | 72:19,22 73:8 | communication |
| 1:24,24 2:9 | break 63:6 84:7 | 40:17 41:14,21 | 79:1,3 80:15 | 45:9 51:6 |
| beginning 30:12 | brief 66:2 84:11 | 41:24 42:12 | checkbook 83:4 | company 28:19 |
| 66:3 72:21 | bring 55:13,19 | 43:14 44:19 | checked 35:20 | 29:4 54:1,4,10 |
| 84:12 | broken 48:19 | 45:25 48:5 | 73:4 | 54:12 75:17 |
| begins 27:5,11 | broker 80:4,19 | 52:3 53:15,19 | checking 15:12 | complaint 42:12 |
| behalf 2:2,6 6:8 | 80:24 81:4 | 54:20,20 59:11 | 22:21,22 72:12 | 45:14,17,19 |
| behave 57:12 | brought 13:14 | 64:9 66:19 | checkout 39:25 | 46:18 47:25 |
| believe 44:2,21 | 80:8 84:3 | 68:14,19 79:4 | checkpoints | 51:18 52:19,23 |
| 46:5 68:7,9,10 | **Building** 4:15 | 79:13 81:15 | 23:7 34:14 | 77:6,16,17,22 |
| 69:15 | business 4:14 | cases 36:22 43:5 | checks 15:14 | 77:24 |
| bells 36:8 | 21:1 61:4 78:6 | 58:5 | 16:14 73:17 | completed 46:10 |
| benefit 55:3 | 78:14 79:21,22 | cataloged 70:12 | choose 33:24 | completely |
| best 81:4 | 79:24 | catastrophic | **CIRCUIT** 1:1,1 | 15:15 |
| better 34:19 | busy 63:2 | 57:21,22 | circumstances | compliance 9:12 |
| 50:25 51:1 | | categorically | 36:3 | 9:15 32:17 |
| big 38:14 65:1 | **C** | 20:3 57:19 | claim 1:9 10:2 | complying |

Consor & Associates
Reporting and Transcription, Inc.

40:20
computed 69:18
computer 23:24
  29:11 30:10
  33:9 45:16
  47:16 48:12
  49:4 50:20
  54:6,9 65:3,15
  65:18,20,22
  67:15 68:12,23
  69:2,3,13 70:1
  70:16 71:12
  72:15 77:1
  79:8,14 81:2
concerned 10:22
concerning 77:6
conclusion 46:4
conditions 26:12
confirm 78:22
confirmed 44:10
confused 44:18
conjunction
  24:25
conservator
  6:19 83:17
considerably
  14:11
consisted 46:2
Consor 1:23
contact 25:5
  29:20
Continued
  84:14
Continuing 78:4
contractual
  56:18,25
control 17:8
  22:12,14
controls 50:7,25
copied 66:20
copies 49:16
  65:17 78:20
copy 16:13
  23:13 31:10
  42:18,19,19

45:15,15 63:19
  77:22
corporate 2:4
  32:17
corporation
  6:12,15
corporations
  6:17 7:5
correct 5:9,11
  5:21 6:10 9:4
  14:22,23 16:7
  18:6,13 20:22
  20:25 22:1,5
  22:23 24:11,23
  30:23 31:8
  34:7 37:15
  41:14,18 42:23
  43:14 44:19
  45:4,17 51:13
  54:4 59:13
  65:12 66:25
  67:13,24 68:15
  69:9,19 72:1
  75:18 76:6,16
  77:7,10,11
  80:1 81:14,25
  82:9 83:19
correcting 9:3
correctly 58:22
counsel 11:11
  41:9 42:6
  49:17
count 41:10
  42:14 47:25
  78:2
country 37:7
COUNTY 1:2
couple 12:8
course 57:14
  60:8 62:3 78:6
  78:14 79:20,24
court 1:1 7:15
  41:25 42:19
  48:23 52:24,25
  53:1

cover 9:20 21:11
  23:2
covered 65:9
create 50:16
created 50:4
creates 50:15,16
creditor 54:13
criteria 58:12
CSR 1:23
curiosity 55:20
current 10:10
custodian 28:1,9
  28:17,21,24
  29:5,9 30:9,10
  30:19 31:7,11
  32:22 33:5
  34:10,11,15,16
  35:15,22 36:5
  36:8,23,24
  37:15 38:17
  39:24 44:4,8
  46:3,14 49:22
  50:14,18
custodians
  31:17 32:10
  33:24
customary
  78:16,17,19
customer 78:20

D

D 3:1 4:16
data 24:3 50:13
  65:13 79:12
database 28:4
  30:16 33:8,11
  33:14 49:24
  50:2,3
date 20:8,9,10
  70:11,19 77:20
dated 54:25
dates 79:2
day 11:21,24
  13:17 20:6
  26:6,6 27:4

32:21 34:15,24
  35:12 37:6,19
  44:2,5 47:10
  82:9
days 25:13,25
  25:25 34:10,14
  37:8 40:18,18
  44:13,14,14
  46:5,6,24 47:5
  47:6,8,9
DEAD 1:9
dealing 40:10
Deborah 1:23
debt 10:10,18
  14:3,19 23:25
  48:8 54:13
  57:17 58:12
  63:15 66:9
Debts 15:5
December 76:14
decide 59:12
decided 47:2
decision 13:1
  24:22 26:9,11
declarations
  14:7
declare 74:11
decreasing 11:6
deduct 69:4
default 2:3 9:14
  9:14,18 10:20
  19:2 24:8
  40:18 57:21
  64:9,20
defaulted 40:5
Defendants 1:12
  2:6 3:13,13,14
  3:14,15,15,16
  3:16,17,17 4:2
DEFENDAN...
  1:8
definitely 44:18
  66:18,18
delays 19:25
delegating 59:16

delinquency
  26:6
delinquent 25:5
  25:21,22 58:17
  58:18,19,20
delivered 17:9
  81:8
department 8:5
  8:14 12:14,16
  12:17 13:5
  24:11 31:21,22
  31:24,25 38:5
  45:4 61:15,16
  73:21
departments
  12:24
depending
  25:24 71:1
depends 8:20,21
  15:23 39:5
  70:20 82:1
deposition 1:14
  7:14 42:3,11
  63:12 76:10
  82:12
depositions 5:24
  7:12
describe 49:6
described 49:19
  62:8
describing 19:4
  48:25
designated 66:5
desk 17:20
  19:23 36:15
determine 25:4
  30:8,20
determined 8:19
determines 29:8
Deutsche 6:20
  7:6 26:1,1,3,3
  28:9,11,18
  29:1,4,5 38:11
  47:5 52:6
  53:25 54:3,9

54:12 59:12,14
59:17 60:20
61:6 62:5,9,11
62:11,18 81:25
82:2,4,5,8
**DEVISEES** 1:10
**diem** 69:17
**differ** 53:11,12
**difference** 38:14
49:20
**different** 9:13
18:22 23:6
28:24 44:1
48:17
**digit** 72:4
**diligent** 45:21
45:24 46:1,9
**diligently** 59:15
**direct** 3:4 4:9
7:22,25 19:12
24:20
**directed** 40:15
**directly** 19:10
50:6
**discussed** 30:15
62:1
**discussing** 77:2
**discussion** 22:11
25:12
**dismissal** 11:11
**distribute** 13:9
19:14
**divided** 13:21
**divorce** 57:22
**doc** 28:1 30:18
31:17 34:15,15
36:8,23,24
44:3 46:3
48:20 50:14,18
50:22 64:18,20
**docs** 12:6,7
13:16 24:4
**document** 14:10
14:13 15:15
16:1,3,5,19

17:12,14 18:9
19:25 20:12,16
21:5,25 22:21
22:23,25 23:2
23:3 29:9
30:18,20 35:4
36:1,11,13,23
36:25 37:1,2
50:24 51:9,10
53:8 63:12
71:13,18 73:12
73:25 75:7
76:3,13 82:13
82:18
**documents**
11:19,22 12:2
12:9,10,15,18
13:2,11,19
14:5,25 15:13
16:19,20 17:1
17:7,9,18,25
19:1,14,16
20:25 21:14
22:20 23:12
27:11,13 28:15
28:18 31:8
32:8,19,23
35:7,23 50:18
50:19 64:19
77:5,10 78:5
78:12,21 81:7
81:16
**doing** 7:16 9:2
10:6 31:7
38:18 41:15
59:23 72:10,12
72:20 73:20
79:23 80:19
**dollar** 8:18,19
8:22
**double** 72:5,6,19
72:22 73:7
80:15
**download** 15:24
**drawing** 72:15

**Drive** 2:4
**DTI** 57:17
**dual** 21:15,16
**due** 10:23 45:20
45:24 46:1,9
70:18 77:19
**duly** 4:7
**DUSTIN** 2:7
**duties** 7:21 9:6,9
11:16,19

———————
**E**
———————
**E** 2:7 3:1,11
14:12
**earlier** 54:15
**easy** 67:9
**economic** 10:24
10:25
**effective** 79:2
**eight** 13:19,21
23:6
**either** 51:14
80:10
**electronic** 6:6,9
69:11
**eliminate** 36:18
**eliminated**
30:21
**employed** 4:19
4:22,25 29:23
29:25
**employee** 27:9
81:5
**employees** 7:22
73:22
**employer** 4:17
**ended** 37:1
**enforce** 51:20,24
52:1,3 53:7
74:6,12,20,22
75:1,8
**entered** 11:11
33:12 61:25
62:1
**enters** 33:13

**entities** 53:18
**entitled** 51:20
51:24 52:1,3
74:6,7,12,20
74:22 75:8
**entity** 15:9
16:16 17:11
30:9 83:25
**entries** 79:8,11
**equation** 10:25
69:21
**Eric** 21:12
**Erica** 1:15 3:3
4:5,13 21:12
**ERRATA** 3:7,8
**error** 72:9 76:4
76:4
**errors** 15:7
30:21 72:23,24
72:25
**ESQ** 2:3,7,7
**estimate** 13:24
54:18
**evenly** 13:9
**event** 20:5,19
**everyone's** 19:6
19:8
**Ex** 32:15,21
33:25 50:21
**exactly** 58:3
**Examination**
3:4 4:9
**examine** 77:12
**examined** 77:4
**example** 9:17
10:8,9 28:25
62:13 67:5
**exceptions** 41:1
**excuse** 30:4 46:1
49:6
**execute** 20:12
**executing** 14:9
**executive** 8:23
**exhibit** 3:13,14
3:14,15,15,16

3:16,17,17
42:7,11 63:5
63:11 82:12
**exhibits** 3:13 4:2
42:3
**exist** 5:8 76:11
76:16
**exists** 6:3
**expect** 46:3
**expected** 25:13
**expecting** 25:8
25:15 72:13
**experiencing**
10:5
**expert** 57:2
**expertise** 57:10
68:9 80:20
**explain** 7:18
**explains** 34:17
**e-mail** 13:16
34:17 46:2
49:15,17 50:17
**e-mails** 31:7,10

———————
**F**
———————
**facet** 10:7
**fact** 20:24 26:20
74:5,25
**facts** 78:9 79:10
**factual** 52:24
**fair** 14:24 54:13
**fall** 59:12
**fallen** 26:8
**familiar** 7:14
64:19 76:23
**familiarity**
22:13
**Fannie** 40:23
57:11 60:24
**Fannies** 59:19
**far** 39:14 80:24
**Fargo** 28:23,25
29:1,6
**faster** 30:20
42:5

fault 10:1
FDIC 5:11 6:18
6:19 7:8 12:4
57:1 58:9,10
58:24 59:18
61:8 62:7
83:16,17 84:1
February 44:11
79:4
Fed 32:15,20
33:25 50:21
Federal 1:4 4:23
5:13,13,18,21
6:18 7:9 9:1
53:17 58:11
74:20 75:18
76:1,2,5,8,12
78:13 81:22
83:9,11,16,22
83:22
feds 37:21
feel 9:4 34:2
fees 11:12 25:18
fewer 12:1
fictitious 1:11
Fidelity 76:21
field 47:16 49:2
FIFTEENTH
1:1
figures 14:23
15:3,5,20,22
79:1
file 26:16 40:25
41:9 42:19
48:7 64:13,16
64:20 65:24
filed 40:4,17
41:21 46:11,18
52:19 74:16
files 45:13
filing 36:10 40:8
40:8 41:3,6
filings 36:10
fill 8:3 65:16
66:11

filled 16:10
final 63:17,18
63:19 74:3
financial 78:16
78:20
find 23:14 34:18
35:15,17 36:9
38:2,17 49:23
finding 47:17
finish 43:24
finished 43:13
fireproof 32:11
32:18 35:23
firm 16:6,10,17
32:20 35:6
43:21 47:11,21
49:23 64:6,7,8
65:12,12 66:8
66:11 71:10,16
71:16 72:14
firms 9:25 15:24
16:1 17:14
23:12 27:14,15
34:25 37:11
51:7 70:10
first 4:6 8:12
11:7 24:23,24
25:16 35:2,3,6
40:6,12 74:2
Florida 1:2,20
1:24 2:3,5,9
26:25 27:8,8
30:2,5 40:13
46:21 47:13,14
49:8 62:2 64:9
64:20
focused 79:7
foggy 58:8,8
folks 16:21,25
19:10 23:11
24:16 80:23
follow 62:12
following 25:1
81:22
follows 4:7

34:10
follow-through
51:1
follow-up 34:19
34:21 35:2,3
51:1
follow-ups
34:22
footprint 39:9
foreclose 9:19
foreclosure 5:4
8:17 9:10
10:17 12:10,17
14:8,21 16:2
24:10,14,16
26:10 27:1,2
27:17,22 28:3
36:10 38:21,22
39:1,1,2,8,22
40:4,7,25 41:2
41:5 45:4
46:23 48:18
49:17 61:21
64:14 72:3
82:6
foreclosures
63:3
forensic 9:14,18
10:19 19:2
forever 60:16
forgiven 58:6
60:10
forgiveness 60:6
form 63:22 64:1
forths 51:6
found 27:19,25
30:22 36:20,22
37:9,12 43:19
46:7 47:1,3,15
52:18,20
foundation
30:16
four 12:9,12,18
frame 40:3,9
Freddie 40:23

57:11 60:24
Freddies 59:19
free 9:4
frequently
38:13
friends 29:22
front 55:17
81:10
FSB 1:4 4:23 5:1
5:8,14,21 6:18
53:17,18 74:20
75:18 77:5
78:6 81:22
full 4:11 57:24
57:25
functioning 30:9
funds 82:3
future 58:19
70:13,19 71:6
——————
G
gap 37:4
gatekeepers
25:17
general 57:5
58:11 67:19
generally 21:7
45:18
generates 70:9
genuine 74:5
getting 9:23
17:6 19:23,24
19:24 27:5,14
36:19 37:2
61:11 66:9
give 7:11 9:17
18:12,14,16,16
22:3,4 65:17
75:7 84:5
given 13:13
75:10,12
gives 13:21
giving 38:25
73:5
go 14:17 16:14

17:24 18:23,24
19:22 22:7
24:7 25:25
36:8 48:9,20
49:8,10 50:11
56:7 57:19
59:17,18 61:7
61:8 62:2 65:8
66:8 69:12
76:3
goes 10:17 14:21
22:12 27:8,10
30:17 50:18
71:14,15
going 10:23 11:1
13:15 19:1
25:9 31:17
36:22 37:21
49:6,8 52:2
58:15 60:16,22
62:7 63:9
69:24 70:18
71:2 76:22
79:2 84:7
good 28:25
govern 56:6
57:3
governed 40:22
government
25:25
governs 54:24
granted 83:24
GRANTEES
1:10
greater 10:14
greatly 60:9
groove 19:6
group 2:3 9:14
9:14,18 10:8
10:20 18:16,20
18:21 19:3
56:5 62:14
guess 13:15
54:16 81:4
82:1

**ᴡ‌nsor & Associates**
Reporting and Transcription, Inc.

| | | | |
|---|---|---|---|
| **guidelines** 25:1 | **hour** 11:21 | 5:17,20 6:18 | **introductory** |
| 39:6 40:16,24 | **hours** 19:19 | 6:18,19,20 7:8 | 74:15,24 75:2 |
| 41:1 | **house** 60:16 | 7:9 8:24,25,25 | **investor** 9:19,23 |
| **gun** 50:20 | 82:9 | 11:8 53:17,18 | 10:6,12 25:24 |
| | **housed** 28:15 | 54:21 58:11 | 26:2 28:19,23 |
| **H** | **How's** 7:24 | 68:15,18,19 | 29:5 30:19 |
| **H** 1:23 3:11 | | 74:20 75:15,16 | 31:4 39:6 52:6 |
| **HAMP** 57:1,10 | **I** | 75:18,20,25 | 54:7,10 60:24 |
| 58:15 59:18 | **Ice** 2:7,8 3:4 | 76:1,5,7,10,12 | 61:7 62:12 |
| 60:2,23 61:7 | 4:10 42:6,9 | 76:15 77:5,9 | **investors** 40:16 |
| 61:12 62:15 | 43:12,23 45:2 | 78:5,13 79:25 | 57:12,13,13 |
| **hand** 17:12 19:9 | 52:21 55:15 | 80:18,24 81:4 | 61:1,5,12 |
| **handed** 19:17 | 63:4,9,10 | 81:8,21 82:7 | 62:13 |
| 42:10 | 66:13 82:23 | 83:9,11,16,16 | **investor's** 25:1 |
| **handles** 9:15 | 84:10 | 83:21,22 | **involve** 58:23 |
| **hands** 17:13 | **ID** 64:18 | **information** | 59:23 |
| **hand-offs** 36:11 | **idea** 12:7 51:9 | 14:22 15:24 | **involved** 38:1,4 |
| **happen** 13:4 | 57:5 58:12 | 19:23 24:6 | 67:11 |
| **happened** 37:20 | 65:5 79:7 | 29:10 30:19 | **INV1** 30:11 31:3 |
| 44:15 48:21 | **identification** | 33:13 48:10 | 31:4 50:11 |
| **happening** 37:7 | 4:3 | 66:12,12 67:19 | **in-house** 12:7 |
| 59:20 79:24 | **II** 42:14 84:14 | 68:8,11,22 | **ISRAEL** 1:7 |
| **happens** 27:7 | **image** 16:13 | 70:10 78:8,24 | **issue** 35:9 36:20 |
| 31:14 34:24 | 66:16,19 | 79:9 81:1 | 44:2,5,14 45:5 |
| 36:6,9,11 | **images** 66:20 | **informed** 28:4 | 45:7 46:25 |
| 37:18,18 68:7 | **imagine** 33:19 | **initial** 47:4 | 47:10,12,20,21 |
| **head** 6:21 | **improved** 82:20 | **Initially** 70:4 | 49:14 74:5 |
| **HEIRS** 1:10 | **incarnations** 5:6 | **input** 66:24 | |
| **help** 30:20 61:2 | **include** 7:21 | 68:20 | **J** |
| **high** 9:15,16 | 14:2 23:1 | **inputs** 47:17 | **Jacksonville** |
| 10:4,9 24:7 | **included** 14:6 | **instruct** 41:9 | 30:4 |
| **high-loss** 10:9 | 23:8 61:12 | **insure** 25:17 | **job** 7:11,21 9:6,9 |
| 11:6 | **includes** 22:25 | **intended** 55:18 | 11:16,19 20:4 |
| **hired** 41:22 | **income** 57:17,22 | **interest** 1:9 58:2 | 26:20 31:7 |
| **hold** 27:5 84:5,6 | 58:13 | 58:3 69:16,17 | 40:20 56:10 |
| **holder** 51:19,24 | **incorrect** 73:12 | 69:20 70:12,18 | 58:20 |
| 51:25 52:8,11 | 75:21,24 | 70:21,22,24,25 | **Joe** 64:12 |
| 53:1,6 | **increased** 11:8 | 71:3 79:5 | **Johnson-Seck** |
| **home** 58:8 61:3 | **indication** 35:11 | **interested** 20:1 | 1:15 3:3 4:5,13 |
| **homes** 61:4 | **individual** 1:8 | **Internet** 56:16 | **JOSEPH** 2:3 |
| **honestly** 37:24 | 24:4 | **interpret** 82:1 | **JR** 2:3 |
| **hook** 50:20 | **INDX** 54:21 | **interpretation** | **judge** 55:3 |
| **hope** 32:12 | **Indy** 16:18 | 75:4,24 | **judgment** 74:4,7 |
| 35:19 | **IndyMac** 1:4 | **interrogatories** | **JUDICIAL** 1:1 |
| **hopefully** 42:4 | 4:22 5:1,6,8,13 | 82:16 83:5 | **July** 1:19 5:9 |

| | |
|---|---|
| 76:11 | |
| **jump** 22:11 | |
| **June** 39:8 | |
| **jurat** 15:8 | |
| **jurisdictions** | |
| 9:13 | |
| **jury** 55:3 | |
| | |
| **K** | |
| **Karen** 8:8 | |
| **keep** 33:1,4 34:6 | |
| 35:22 63:9 | |
| 78:20 | |
| **keeping** 11:5 | |
| 50:25 | |
| **kept** 32:11 33:7 | |
| 77:5 78:5,12 | |
| **kind** 14:5 20:13 | |
| 27:17 49:7 | |
| 53:13 60:7,10 | |
| 71:15,25 | |
| **know** 5:23,24,24 | |
| 7:2 9:5 17:14 | |
| 20:11,15,15 | |
| 21:21,22 22:10 | |
| 22:24 24:3,5,5 | |
| 25:13,19 31:17 | |
| 34:18 35:7 | |
| 36:16 38:6,9 | |
| 38:10,20 39:11 | |
| 39:15 43:2,11 | |
| 43:20 44:7,23 | |
| 45:7 46:18 | |
| 48:6 49:7 | |
| 50:13 51:2,7,8 | |
| 51:14,23 54:14 | |
| 54:16,17 55:10 | |
| 55:10 57:3,19 | |
| 57:20,22 58:3 | |
| 58:9 60:4,8 | |
| 61:3 62:2,4,5 | |
| 62:17,20,23 | |
| 63:4,5 64:4,11 | |
| 64:12,23,25 | |
| 65:9 66:17,18 | |

### Censor & Associates
#### Reporting and Transcription, Inc.

| | | | | |
|---|---|---|---|---|
| 68:6,25 71:15 | level 9:16 72:9 | 20:1 39:17 | 53:2 58:19 | manages 18:21 |
| 71:16 72:11,18 | line 22:21 25:20 | 58:17 63:22 | 65:10 78:1 | 19:2 27:12 |
| 72:18 73:1 | 46:15 74:2 | 70:22 81:12 | lot 36:20 50:10 | managing 36:16 |
| 75:23 77:16,18 | list 23:14,15 | longer 6:3 61:21 | low 15:7 | 36:17 |
| 77:23 78:1 | 31:10,15 50:15 | look 9:21 16:16 | lower 58:2,3 | MANCILLA |
| 79:10,12,15,16 | 50:16 63:18 | 16:21 22:24 | 60:17 | 2:3 42:8 43:2,6 |
| 79:16,17,19 | little 18:23 42:5 | 30:10 42:7 | LPS 15:18,20 | 43:15,17,19 |
| 80:8,11,12,16 | 44:17 70:17 | 43:8 45:11,12 | 16:11,13 17:3 | 44:24 52:16 |
| 80:22,22 81:10 | live 60:16 | 45:19 46:15 | 17:13,16,17 | 55:14 63:7 |
| knowing 73:24 | lives 30:4 | 48:6,9,14 | 21:7,18 22:12 | 82:21 84:9 |
| 80:6 | loan 23:2,3 | 51:18 54:5 | 23:11 24:1,5 | manner 32:23 |
| knowledge 78:9 | 24:10,24 25:2 | 56:7,9,15 | 24:22 26:12,14 | 55:8 |
| 78:11,25 79:10 | 25:5 26:10 | 63:11 67:18 | 27:4,9,17,18 | manually 68:6 |
| 81:13,15,19,20 | 27:1,8,17 29:4 | 68:17 70:5 | 27:21 28:5 | 72:10 |
| KNOWN 1:9 | 30:17 46:20 | 72:11,20 76:18 | 29:8,23,25 | manual-ness |
| | 48:15,17 50:14 | looked 57:15 | 30:1 48:25 | 50:10 |
| _____ L _____ | 53:15,19,21,23 | 80:8 | 49:18 65:25 | March 4:21 5:16 |
| lag 70:15 | 55:9,9,11 | looking 8:2 | 71:11 76:21 | 54:25 83:15 |
| Lake 2:4 | 56:20 58:1,6 | 26:24 34:16 | LPS's 48:16 | marked 4:3 42:3 |
| Lakes 1:19,24 | 59:15,17 60:12 | 48:7 56:3,5 | 49:21 71:17 | 42:10 82:11 |
| Lane 4:15 | 60:13,14,15,19 | 74:22 78:23 | Luis 29:15,20 | marketing |
| large 10:13 | 60:24 61:7,25 | looks 8:20 22:24 | | 62:24 |
| largest 39:9 | 63:16,16 67:18 | 22:24 50:11 | _____ M _____ | Mastro 8:8 |
| law 2:3 16:10 | 67:24,25 68:10 | 73:14 | M 1:7 | MAS1 30:11 |
| 35:6 49:23 | 69:19 75:21 | loose 60:18 | Machado 1:7,7 | 31:2,3 50:11 |
| 64:7,8 65:12 | 76:16 78:7 | losing 37:22 | 5:25 6:3 41:16 | material 74:5 |
| 74:7 | 80:14 81:12,13 | loss 8:5,9,13,18 | 41:24 42:12 | math 13:20 |
| lawsuit 41:3,7 | loans 10:11 15:5 | 8:19 9:15 10:4 | 54:20 63:15,16 | 46:21 |
| 82:8 | 18:21 25:25 | 10:9,9 45:12 | magic 44:15 | matrix 13:3 |
| learns 27:25 | 26:4 38:1,20 | 56:4,21 57:1 | mail 32:13 36:15 | 16:15 22:18 |
| leaving 18:25 | 38:21,25 39:8 | 57:22 61:15,19 | 36:17,17 | matter 57:2 74:7 |
| legal 2:8 36:21 | 39:21 57:4,15 | losses 10:5,13,14 | mailing 66:22 | MB 1:3 |
| 40:6,12 | 59:16 60:2 | 10:23 72:24 | main 12:9 28:9 | mean 8:21 11:3 |
| Lehman 62:13 | 62:6,14,15,18 | lost 12:7 13:4,6 | mainframe 24:2 | 16:23 23:16 |
| lender 68:14 | locate 38:12 | 14:2 35:1,10 | 50:12 | 36:2,15 38:4 |
| 79:25 | 47:23 | 36:20 37:5,13 | making 19:8 | 41:22 44:25 |
| letter 23:2 32:20 | locations 36:12 | 37:24 38:11,12 | 60:7,17 | 53:4 56:21 |
| 33:16 | locked 35:23 | 39:12,16,22 | manage 9:6,10 | 72:19 81:15 |
| letters 9:12 | log 65:19 67:18 | 41:10,11,14,19 | 9:11,13 19:7 | meaning 8:2 |
| 27:14 65:1 | logged 69:3 | 41:25 43:14,15 | 26:20 61:13 | 70:23 |
| let's 7:25 10:3 | logical 22:9 | 43:16 44:2,19 | managed 10:7 | meaningful 50:7 |
| 13:18,18 37:25 | logically 21:24 | 44:22 45:10 | management | means 15:12 |
| 40:13 42:2 | 22:7 | 46:14 47:21 | 15:25 35:10 | 41:2 46:10 |
| 44:17 70:20 | logs 28:4 78:20 | 48:1,4 51:3,14 | 47:11 48:11 | 49:12 |
| 82:11 | long 4:19 14:9 | 51:16 52:13,17 | 51:10,11 | meant 67:17 |

68:3
mediation 62:2
  62:3
mediations 61:6
  61:24 62:6
mediator 62:3
meet 58:12
meeting 61:10
Mellon 7:1
mentioned
  12:12 33:8,15
  47:6 54:15
message 34:17
  49:3
met 26:12
middle 42:2
  64:13
mind 11:5 40:11
  43:5 44:25
Minnesota
  16:20 22:14,20
  23:11 30:2
  71:21
minutes 11:25
  18:11
missing 52:18
mit 8:5,9,13
  56:4,21 57:2
  61:15,19
model 59:18,19
  62:7
modification
  58:9
modifications
  59:23 61:25
modified 55:9
  56:20 57:4
  58:2
modify 56:22
module 48:18
modules 48:18
moment 22:11
  45:7
money 60:15
  81:22,24

month 7:13 39:5
  39:8,18,19
monthly 70:23
months 58:1
  70:13,13
morning 61:10
mortgage 6:5,9
  45:22 51:19,20
  51:21,21,25,25
  52:1,1,4,4,9,9
  52:12,12,16
  54:21,21 74:6
  74:12,21 75:9
  80:4,19,24
  81:3
motion 74:3
  75:13,13
move 42:4 63:5
moved 60:11
multiple 36:9
M-A-S-T-R-O
  8:11
_____
            N
_____
N 3:1
name 4:11 8:10
  21:9,10,10
  29:12 52:23
  62:25 63:24
  80:9
NAMED 1:8
names 1:11
  21:10
nation 39:7
National 28:18
  29:4 53:25
  54:4,10,12
near 78:7,23
  79:17
necessarily 10:8
  28:20 38:18
  60:10 75:24
need 7:18 18:8
  27:2 47:22
  66:7 77:25

needed 23:18
  39:12 50:8
NEENA 1:7
Neither 53:17
network 9:7
  26:21
never 28:3 41:14
  41:19 43:14
nevertheless
  8:13
new 6:20,22,24
  6:25,25 34:13
  39:1 49:24
  82:19,20,21
nine 23:6
nonexistent
  83:25
normal 79:20,24
normally 39:24
Notaries 18:5,13
  18:14,20,22
  19:15 20:24
notarization
  21:20
notarize 19:10
  19:13,16 20:2
  20:8
notarized 19:19
notarizes 17:13
notarizing 19:8
  20:9,10
Notary 17:12
  18:15,17 19:13
  19:24 20:2,3
  20:19 22:4,8
note 13:4,6 14:2
  26:24,25 27:6
  27:19,23,25
  28:2,3 34:9,18
  35:1,10 37:5
  37:24 38:3,11
  38:12 39:12,16
  39:22 40:1,1
  41:10,10,13,25
  42:18 43:1,14

43:21 44:2,18
  44:22 45:10,12
  45:22 46:7
  47:1,3,15,18
  47:22 48:1,4
  49:23 51:3,14
  51:16,20,21,25
  52:1,4,9,12,12
  52:16 53:1
  54:7 65:10
  74:6,12,21
  75:1,9 78:1
notes 36:19,21
  37:9 49:2,13
  49:14,15,16
noticed 37:4
NOTIFICATI...
  3:9
notify 35:3
November
  41:20 42:25
  44:7 46:11,18
number 3:12
  13:13 22:25
  23:3,4 38:23
  44:15 48:15,17
  50:14,23 64:16
  64:18,20,21
  69:17 72:22
  73:17
numbered 75:2
numbers 23:21
  23:22,25 30:17
  64:25 65:16,22
  66:23,24,24
  67:3 70:7
  71:10 72:1,5,6
  72:9,16 73:5,8
  73:12,15,17
_____
            O
_____
oath 3:5 7:16
  20:13,22
Obama 57:8
  58:23 60:22

62:10
Obama's 57:1
obtain 42:18
  45:22
obtained 42:20
Obviously 61:3
October 46:23
offer 8:20
offered 60:3,5
office 13:16
  16:21 17:22
  18:3,5,7,9 19:9
  21:3 29:23,25
  30:6 32:16
officer 6:5,12
  7:4,7 16:22
  52:25
Oh 8:11 20:18
  65:6 67:17
okay 6:1 7:18,24
  11:24 12:14
  13:1,11,24
  21:14 23:20
  24:5,9 26:9
  30:8,14 31:4
  31:14 33:24
  34:13 40:10,14
  42:8 44:7 46:8
  47:8 48:4
  50:12 51:12
  52:2 53:5
  55:22 56:7
  59:3 63:8,11
  64:4,15 65:24
  66:23 67:17,22
  68:14 71:9,22
  72:3 73:16
  74:17 75:3
  80:23 82:11
  84:10
old 63:24 64:1
once 17:7 26:11
  71:7
ones 39:2,15
OneWest 4:18

Sensor & Associates
Reporting and Transcription, Inc.

Page 93

4:19 5:3,17
7:10 9:1,3 10:5
16:18,22 25:6
26:23 27:5,16
27:21 28:9
29:11,24 31:22
31:24 32:14
33:1,5 34:4,10
35:8,14 36:12
37:15,19,23
41:9,22,22
42:25 45:4
49:25 52:8
53:14,17 54:25
59:7,17,22
61:2,3 62:17
62:23 68:20
71:11 73:4,17
74:11,11,25
79:22 82:3
83:19
OneWest's 68:4
one's 72:10
on-site 28:5
on-sites 21:8,18
30:1
open 44:14
48:21
opened 36:15
openings 8:1,2
opposing 11:11
opt 57:14 62:9
option 60:19
options 51:23
order 49:10
ordering 27:11
original 17:15
26:24,25 27:6
27:11,13,18,23
27:25 28:1,3
30:18,18,19
32:7,22 35:7
35:23,25 36:11
36:13 38:2
39:22 43:1,21

48:20 67:12,23
67:23 68:14,18
69:6,18,22
79:25
originally 67:22
outcome 58:13
outside 31:16
32:16 56:1,19
outsource 9:25
12:5 15:14,14
15:15,17
overall 39:7
overlay 51:5
overseeing
80:25
owed 77:21
81:22,24 82:2
owing 67:13
70:18 77:19
owned 10:11,12
53:23 60:19
owner 54:6
owns 72:4
o'clock 47:12,13
47:14

P
package 32:13
packet 66:8
page 3:2,12
63:17,19
pages 1:17 22:25
paid 11:12 62:17
Palm 1:2,19,20
1:24,24 2:9
paper 45:6
papers 68:17
paragraph
42:14 45:19
51:18 65:8
74:15,24 75:2
75:7,22 76:2
76:22 78:4
81:21
paralegal 16:7

72:16
pardon 71:11
parens 42:15
parentheses
42:15
Parmer 4:15
part 7:11 9:6
26:20 56:10
61:1 65:25
68:4
particular 49:9
55:2 75:10
79:12
parties 1:7,9,11
Pasadena 27:10
28:8 30:1,6
36:14 47:13
63:2
pass 19:3 82:5
passes 18:21
pass-through
54:22
pause 66:2
84:11
pay 15:8,8 25:18
58:7 60:15
paying 69:13
payment 25:11
25:12,12,15
57:24,24,25,25
60:7,8,17 69:9
69:12
payments 67:16
69:3
payoff 70:9
pays 60:14
peek 21:3
peers 12:18,19
12:21
peer's 21:10
penned 52:23
people 8:1 18:24
18:25 33:13
39:25 76:18
81:1

percent 15:4,7
15:11,12,16
38:7,8,8 39:9
39:21 57:17
72:8,8 73:2,2,3
73:7,13,13,14
percentage 38:1
62:20
performed
45:24
period 46:3,5
person 24:4,13
28:5 31:18,18
37:1 49:5
50:12 72:12
personal 71:25
78:9,11,24
79:10 81:13,15
81:19,20
personally 9:6
13:25 14:24
61:24
persons 78:8,24
79:9
perspective
10:21 56:21
phase 73:2,2,3
phone 1:25 25:8
25:10
physically 17:18
17:19 19:8
53:8 66:14
68:22 69:8
81:7,7
picked 21:22
piece 60:9
place 50:7
plaintiff 1:5 2:2
5:20 6:2 42:17
45:14,21 51:19
74:5,7,19 75:8
75:17,25 76:12
81:21 82:7
83:21
Plaintiff's 74:3

plan 25:2,11,12
57:15,24 58:9
60:4,23,23
61:8,8,12,19
play 46:24
please 4:12 8:10
9:4 54:17
55:16
POA 7:6
point 21:5 26:23
27:16 30:12
44:13 61:11
67:15 68:20
69:23 71:24
76:20
pool 62:21
Pooling 55:4,7
56:7,9
populate 16:1,3
16:4
populated 16:9
positions 8:3
possession 1:11
45:22
possible 46:24
59:1,2 81:3
possibly 71:5
power 12:5
83:24 84:2
Practices 54:13
predecessor
49:11
preferred 26:17
premarked 42:4
prepare 35:1,10
47:21,23
prepared 64:4
73:1
prepares 72:14
preparing 27:13
66:19
prescribed 25:2
presentation
23:5,8
presently 42:17

**Censor & Associates**
Reporting and Transcription, Inc.

**president** 5:4
6:10 7:10 8:8
8:12 24:8,8
45:3 57:14
73:21 83:10
**presume** 80:17
**pretty** 35:25
**previous** 28:2
36:21 42:3
**principal** 58:5
58:14,24 59:5
59:10,11,23
60:5,6,9 61:9
67:8,12,13,20
67:23,24 69:4
69:6,21,22
79:5
**print** 22:20 67:4
71:9 80:10
**printed** 16:20
45:16 71:19,21
**printing** 66:21
**prints** 16:13
66:1,10,14,24
**prior** 4:22,25
70:13
**privacy** 23:4
**probable** 28:21
**probably** 9:2
13:18 37:7
38:21 51:9
57:18 80:3
81:3
**problem** 47:17
**procedure** 14:16
14:18 17:6
24:9,23 37:4
38:10,14 39:25
43:25
**proceedings**
66:3 84:12
**proceeds** 82:9
**process** 7:15
9:11,11 15:4
15:25 17:8

19:5,7,22
21:23 26:23
27:5,12 30:13
30:14,23 35:9
36:18 44:12,16
47:11,19,19,20
48:11,20,21
51:1,10,11
61:13 65:4,11
65:25 71:15
72:7 73:10,13
80:25
**processors**
22:19
**program** 23:24
48:12,24 49:4
57:1,2,10
58:15,23,24
60:2 61:19
62:10,16
**programmed**
69:2
**programs** 57:6
77:2
**project** 71:5
**projected** 70:21
**projecting** 70:17
**promissory**
41:13
**prompted** 38:19
**property** 9:19
10:17,19,23
11:1,5
**provide** 70:10
**provided** 16:15
65:13 68:11
**provisions** 56:25
**PSA** 26:3 40:22
54:24 55:2,4
55:11 56:3,5
56:19 59:14
**publishes** 71:8
**pull** 32:10 36:25
37:1 48:15,16
50:14 56:12

66:16,18
**pulls** 30:18
**purchased** 5:17
**purchasing**
68:10
**purpose** 74:4
**purview** 17:10
**put** 15:20 20:8
42:2 49:13,14
57:23 67:22
68:3 69:23
70:11 72:15
81:1
**puts** 15:22 50:22
71:10
**P-A-R-M-E-R**
4:15
**P.A** 2:8
**P.L** 2:3
**p.m** 1:20,20 66:3
66:4 84:12,13

**Q**

**QC** 15:4 71:15
72:7 73:2,2,3
73:10 76:18,20
**QCing** 15:15
73:11
**qualifies** 25:23
**qualify** 58:17
**quality** 17:8
22:12,13
**question** 13:14
36:6 40:15
49:12 52:14,22
56:1 74:18
75:6 78:18
**questions** 53:14
**queue** 27:8,11
30:18
**quick** 17:10 54:5
**quite** 51:5

**R**

**R** 3:13

**raise** 44:5 47:10
49:14
**raised** 44:1 45:6
45:7 47:20
**raises** 47:12
**raising** 46:25
**range** 58:2,4
**rate** 58:2,3
69:16,24 70:22
70:24 71:1,3
79:6
**rates** 70:12 71:5
**read** 3:9 14:13
23:9 52:2
55:11 66:6
74:14 78:18
**reading** 55:4
75:1
**ready** 50:24
66:9
**real** 47:11 54:5
**really** 13:3
21:22 22:10
25:16 38:17
40:15 60:6
72:8,9 82:6
**realm** 56:1
**reason** 9:22 10:2
11:1,9 26:7,7
36:25 57:20
75:11
**reasonable**
13:24
**receive** 35:9
**received** 25:10
34:9 60:3
**receiver** 6:19
83:17
**receives** 29:10
**receiving** 27:13
**recognize** 42:11
63:12 64:20
82:12,17
**record** 4:12 28:1
33:9,11 65:14

70:9
**records** 31:12
33:1,4 34:6
76:25 77:5,10
78:5,12,16,16
78:20,22 79:18
**recovery** 10:18
**reduced** 15:6
60:9
**reduction** 58:14
59:5,11
**reductions**
58:24 59:10,24
61:9
**refer** 25:2,9,14
26:5,5,9
**referral** 24:25
25:3,14,23
**referrals** 39:6
**referred** 25:17
27:1,4,7 39:7
41:4,5
**referring** 10:4
24:10 27:16,21
77:20
**refers** 26:14
74:25
**reg** 79:21
**regardless** 41:10
75:6
**Registration** 6:6
6:9
**regs** 79:21
**regular** 78:6,13
**regulated** 79:20
**reject** 16:17
23:11 73:11
**related** 9:15,16
14:8
**relationship**
15:23 54:24
**relatively** 15:7
**release** 31:12,18
32:1,3,7
**relevant** 54:18

Sensor & Associates
Reporting and Transcription, Inc.

remember
37:23 38:15,23
38:23 47:8
80:9
rephrase 36:4
report 13:15
19:10,11,12
23:8,10,13
24:17,18 36:5
50:6 73:22
REPORTED
1:22
reporter 3:6
7:16 48:23
66:6
reporting 1:23
46:14 49:22
reports 7:22,25
19:12 24:19,20
77:14
represent 72:23
79:23
representation
27:18 42:22
representations
52:25
represented
41:24
represents 70:3
reps 49:18
request 34:25
37:10 44:5
46:2 71:1
requested 39:16
requesting 37:5
requests 51:16
require 21:16
41:6
required 32:11
35:22 40:9,17
40:17 57:12
60:23 61:1
62:3
requirement
19:18

requirements
80:21
requires 69:8
requiring 59:20
research 9:14,16
researching
9:18
response 44:3,8
46:4 47:4,9
responses 34:20
82:16
responsibility
56:2 68:5
rest 70:1
restrict 55:8
56:19
restrictions
56:18
resuming 66:3
84:13
return 26:14
35:20
returned 34:16
returning 19:19
review 10:25
11:3,4 77:23
reviewing 48:7
right 13:23
15:11 18:10
20:21 22:6
28:8 29:19
31:1 32:5
33:25 37:1,14
39:13,23 40:13
43:6,17 44:13
44:20 52:8,10
53:13,20 57:16
61:22 63:7
65:15 67:14
69:23 70:6
71:7,7 72:10
73:9,24 75:15
76:5,14,17
79:18 81:17
84:6,8

rightfully 53:7
ripe 24:25 25:3
25:4 26:11
Rodgers 1:23
room 20:19
32:17
rough 57:9
rule 34:13
rules 7:15 47:3
60:25

──── S ────
S 3:11,14
safe 39:20 59:22
safely 33:4
Sandy 32:2,5
50:17
Sansburys 2:8
sat 36:14 80:13
satisfied 35:14
saw 13:15 37:24
saying 23:9 31:1
40:19 46:8
53:4
says 31:4 35:15
42:17 45:14,20
47:21 51:19
74:23 75:11,25
76:22 77:4
say-so 61:13
scan 50:22
scanning 65:3
scheduled 5:23
Schneider 32:2
32:5,6
scope 31:16
Scott 24:8
scrapes 24:2
screen 24:2
30:10 31:1
47:17 48:14
49:15 65:22
66:1,10,14,23
67:4,19 71:9
screens 65:16,18

65:20
Scribner 76:4
scrubbing 50:13
scrutinized
10:12
search 45:21,24
46:2,9
second 34:21
60:14
secondary 62:24
Secondly 77:12
seconds 14:12
15:9,10
section 48:19
sections 56:5
securitized
53:21
see 7:25 9:21
13:18 14:17
16:16 20:24
22:21,23,25
24:24 38:17
40:10,19 42:14
45:5,20 47:15
48:21 51:2,21
55:17 64:15
65:20 67:17,19
70:20 74:8,24
82:11 83:6
seeking 42:18
seen 60:2 76:7
sell 58:7
seller 68:11
send 17:15
24:22 34:25
36:13 49:15
50:24
sending 27:14
sends 33:19
senior 8:8,23
sense 37:17 38:7
66:21
sent 16:9,11,12
26:12,16 27:14
66:14

sentence 45:20
74:23
separate 43:4
58:6 61:15
September
46:21
series 53:14
54:22
service 26:4
59:15 62:14,18
63:18
servicer 75:16
75:21 76:15
78:6,15,19
servicing 52:7,7
55:5,8 56:8,9
62:18 68:5
82:2
sets 8:22
settle 8:16
settlement 8:20
seven 34:14 37:6
46:6 47:5
Seven-day 34:22
severely 58:18
shadows 60:11
sheet 3:7 21:11
Sheila 58:10
59:4
shift 18:24
ship 16:19 32:15
32:23
shipped 16:20
71:23
ships 32:22
shortened 82:21
shot 37:10
shots 59:7
show 36:1 54:9
58:18
showing 74:4
shown 35:4 79:3
side 32:18 71:16
sign 3:9 6:8 7:4
7:6,7,8,9,10

nsor & Associates
Reporting and Transcription, Inc.

11:19 12:6,10
12:15,19 13:2
13:4,6,12,25
13:25 14:7,14
14:18 16:17,18
16:23 17:11,12
17:19,24 18:2
18:11 20:24
21:13 22:5,19
22:22 38:16
70:16 71:20,24
72:3 73:8,15
77:18 83:10,22
83:24
**signature** 12:20
14:11 17:7,10
20:2 21:6
63:17,22 64:1
82:17,19
**signatures** 21:15
21:16,25 82:24
**signed** 12:4
18:17 20:9
21:12 38:12,15
63:24 71:14,18
75:15 76:1,15
77:16 78:2
80:13 81:7
83:5,12
**signer** 12:9
21:18
**signers** 12:11,19
**significant**
37:22
**signing** 6:8,14
7:3 11:21 12:1
12:9 13:16,19
15:1,9 17:11
19:23 40:1
77:19,19
**single** 73:17,18
**sit** 18:7
**site** 17:3 27:9,10
28:7,7
**sits** 32:16

**sitting** 18:9
64:12 80:12
**Six** 13:21
**somebody** 35:20
68:19 79:13
**someone's** 36:15
**somewhat** 30:24
**soon** 27:1 47:9
**sooner** 26:5
46:23
**sorry** 8:11 29:18
32:5 42:7 43:5
43:24 46:17
55:24 56:8
65:7,7 74:13
84:6
**sort** 25:3 39:24
62:9 65:3
74:15 80:3
**sounds** 13:23,23
**speaking** 56:6
71:16
**special** 35:23
**specialist** 14:21
16:3 24:14
25:14 31:6
72:4,19 73:14
**specialists** 24:16
**specific** 40:11,25
**specifically**
12:16
**specifics** 65:9
**spell** 8:10
**spend** 11:21,24
14:9
**spoke** 12:3 37:4
**spot** 15:12
**SPOUSES** 1:10
**spreadsheet**
50:16
**stable** 26:17
**stack** 21:11
**staff** 17:1 37:22
79:1
**standing** 80:10

**stands** 55:4
**start** 26:24
**started** 11:7
29:20 38:2
44:9 76:9
**starting** 5:25
**state** 4:11 11:2
26:25 27:8
46:22 49:8
**statement** 74:24
**statements** 70:9
**states** 9:13 23:4
31:21 40:10
**statistical** 11:2,4
**status** 27:22
**stay** 61:2
**step** 24:23,24
44:17 49:10,11
**steps** 49:9,9,10
**stick** 40:13
**sticky** 72:2,11
**stores** 32:18
**straight** 25:19
67:3,10
**strict** 40:24
**strike** 26:10
56:8 75:16
**strongly** 79:20
**study** 10:20
11:10
**sub** 49:10
**subject** 57:2
**submitted** 74:3
**subtract** 67:15
**successful** 61:19
**suggest** 55:18
**suit** 40:4,8 62:13
**Suite** 1:24 2:4,8
**sums** 81:22
**supervise** 18:14
**supervises** 30:1
**supervision** 7:21
**supervisor**
18:12,20 19:1
29:15

**supervisors**
12:11 19:2
24:18
**support** 74:3
75:13
**supposed** 17:19
23:1 55:19
**sure** 14:22 15:13
16:21 17:10
19:8 29:3 46:5
46:16 48:23
63:1 66:21
68:16 72:19
73:6 80:11,21
84:5
**sworn** 4:7 20:12
20:16
**Sylvia** 27:10,24
28:5 29:8,13
30:6,8 31:6
33:12,12 34:16
35:3 47:10,12
48:1 50:10,15
51:7
**Sylvia's** 32:15
**system** 15:25
16:13 24:2
29:11 36:17,17
48:16,25 49:5
49:15,19,21,21
49:25 50:1,11
50:23 51:15
56:13 65:14
66:15,22 67:10
67:18 68:4,13
70:8,11,13,17
70:25 71:2,17
72:15 76:25
79:8
**systems** 6:6,9
24:3 50:12
54:6,9

———— **T** ————
**T** 3:11,14

**take** 17:6 18:11
20:22 22:3
25:19 40:1,1
42:7 45:19
57:8 63:6,11
67:4,7 72:24
**taken** 5:11 37:8
60:25
**takes** 19:21 20:1
32:3 50:9
**talk** 24:9 67:2
**talked** 11:16
14:16 18:19
29:12 79:11
80:23
**talking** 15:17
16:5 17:1
20:15 21:14
31:20 40:6,11
65:10 67:1
70:4 75:20
77:1
**Tampa** 2:5
**tape** 68:7,8,11
79:12,13
**taxes** 10:3
**tell** 27:21 35:16
35:19 39:7
**telling** 29:2,3
43:13
**template-based**
49:7
**ten** 11:25 18:11
34:10 37:6,6
44:2 46:5,6
47:5,6,8,9
**Tena** 29:15,20
**TENANT** 1:10
1:10,10,11
**tend** 53:10
**tenth** 47:10
**terms** 53:7 55:2
55:7 56:2
69:18
**tested** 44:11

Censor & Associates
Reporting and Transcription, Inc.

| | | | | |
|---|---|---|---|---|
| **testified** 4:7 | 46:15 47:11 | 71:11 | **typing** 72:17 | 33:24 64:1 |
| **testify** 44:24 | 51:13 52:19,22 | **transferred** | **U** | 71:2 82:25 |
| **testimony** 3:3 | 59:4 60:25 | 37:13 | **U** 3:15 | 83:2 |
| 39:14 46:13 | 66:8 70:15 | **transition** 37:21 | **ultimate** 10:18 | **user** 67:20 |
| 47:24 | 73:7,14,18 | **transmitted** | **ultimately** 43:19 | **uses** 34:4 |
| **testing** 44:12 | 75:15 77:10 | 78:8,24 79:9 | 44:18 51:8 | **usually** 15:24 |
| **Texas** 4:16 | 78:2,8,13,23 | **treasury** 31:15 | 52:17,20 59:11 | 25:24 40:23 |
| **thank** 9:3 84:4 | 79:3,18 81:12 | 31:19,20,21,22 | **Um-um** 81:23 | 45:18 67:3 |
| **thereabouts** | 81:12,12 83:12 | 31:24,25 71:7 | **unable** 38:2 | **U.S** 6:20,22 71:7 |
| 35:13 | 83:18 | **treat** 62:15 | 45:21 | **V** |
| **thing** 50:20,23 | **times** 36:23 | **treated** 64:25 | **unchartered** | **V** 3:15 |
| **things** 7:19 10:1 | 55:16 70:25 | **trouble** 57:18 | 60:22 | **validity** 76:3 |
| 23:15 25:4 | 73:11 | **true** 14:13,15 | **underlying** | **value** 10:10 11:6 |
| 31:16 36:16 | **title** 5:3 24:13 | 35:14,18 40:21 | 30:16 | **values** 10:23 |
| 37:3 55:17 | **today** 13:15 | 41:13 45:15 | **understand** 29:3 | 11:1,6 |
| 57:23 65:10 | 25:13 29:3 | 47:19 53:14,16 | 45:1 53:3,5,6 | **various** 5:5 |
| 66:21 79:23 | 30:14 39:3 | 68:24 | 58:22 78:17 | 16:14 19:14 |
| **think** 6:21 13:7 | 43:21 44:4 | **trust** 28:18 29:4 | **understanding** | **vault** 32:11 |
| 29:20 37:2,5 | 47:20 51:4,15 | 53:23,25,25 | 47:24 51:12 | 35:23 |
| 38:13 49:19 | 55:12 56:24 | 54:4,10,12,20 | 53:9 58:23 | **vendor** 9:25 |
| 53:11 59:4 | 59:17,19,22 | 54:21 | 60:18,18 76:20 | 12:5 15:14,15 |
| 68:16 71:12 | 60:21 70:5 | **trustee** 54:3,25 | 81:9 | 15:17 |
| 75:23 76:2,3 | 73:16,19 80:6 | **truth** 81:24 | **underwriter** | **verbal** 20:13 |
| 83:14 | 80:12 | **try** 9:23 13:8 | 80:18 | **verification** |
| **thinking** 43:10 | **toggle** 49:4 | 26:5 30:19 | **United** 31:21 | 71:25 |
| **THOMAS** 2:7 | **told** 22:15,16 | 36:18 57:16 | **UNKNOWN** | **verifying** 19:22 |
| **thousand** 13:21 | 59:4,15 66:7 | **trying** 37:17 | 1:7,9 | **versus** 10:5 |
| **three** 7:21 12:19 | **tomorrow** 60:21 | 43:4 57:19 | **unpaid** 67:20 | **vest** 56:4 |
| 25:13 33:13 | **top** 6:21 21:11 | 67:2 84:5 | 69:21 | **vice** 5:4 6:9 7:10 |
| 34:14,22 36:23 | 73:10 | **turn** 33:15 | **unresolved** 25:7 | 8:8,12 45:3 |
| 58:1 | **total** 10:10 | **turned** 32:19 | 25:11 | 73:21 83:10 |
| **three-month** | 12:14 38:25 | **tweaked** 50:5,6 | **untrue** 39:21,23 | **vice-presidents** |
| 57:23 | **tough** 19:20,20 | **tweaking** 44:16 | **unusual** 35:25 | 12:22 |
| **tied** 71:5 | **track** 50:25 | **Twenty-first** | 36:2,4,7 37:2 | **viewing** 75:6 |
| **till** 37:4 | **tracked** 32:24 | 46:19 | **upload** 51:10 | **Volume** 1:16 |
| **time** 11:24 12:3 | 33:20 | **Twenty-one** | 66:1 71:17 | 84:14 |
| 12:8 14:16 | **tracking** 33:2 | 44:14 | **uploaded** 16:12 | **volumes** 37:7 |
| 18:19 25:22 | 34:6,19 50:22 | **Twice** 7:13 | 19:24 68:12 | **voluntary** 11:10 |
| 27:20 29:12 | **tracks** 23:25 | **two** 5:24 7:25 | 71:12,13 81:16 | **VPs** 12:8,9 |
| 30:15 35:3,6 | **transaction** 78:7 | 15:10 24:20 | **uploads** 17:14 | 32:17 |
| 37:3,10,23 | **transactions** | 36:22 45:12 | **UPS** 32:15,20 | **vs** 1:6 |
| 38:9,15 39:5 | 77:6,15,17,23 | 57:12 82:24 | 33:22,23,24 | |
| 40:3,9 42:24 | **Transcription** | **type** 49:3 69:9 | 34:4 50:21 | **W** |
| 42:24,25 44:21 | 1:23 | **typed** 79:13 | **use** 15:25 23:11 | **W** 3:16 |
| 46:1,3,4,10,13 | **transfer** 64:13 | **typically** 40:24 | | |

Ph. 561.682.0905 - Fax. 561.682.1771
1655 Palm Beach Lakes Blvd., Suite 500 - West Palm Beach, FL 33401

Censor & Associates
Reporting and Transcription, Inc.

| | | | | |
|---|---|---|---|---|
| **Wade** 63:1 | **witness** 4:6,8 | **zero** 38:24 72:8 | **167** 3:15 | **3** |
| **waiting** 61:14 | 21:8,9,17,18 | | **17** 8:1 | **3:14** 84:13 |
| **walk** 19:9 21:13 | 21:25 22:4,8 | **$** | **174** 3:16 | **30** 14:12 15:9 |
| **want** 21:21 23:6 | 43:4,9,16,18 | **$100,000** 11:7 | **179** 3:16 | **30th** 46:21,23 |
| 24:7,7 26:16 | 43:20 63:8 | **$16,088.21** | **18** 45:19 | **30-day** 46:22 |
| 29:2 35:16 | 66:7 84:7 | 69:18 | **181** 3:17 | **300** 2:4 |
| 46:17 54:16 | **witnesses** 18:8,8 | **$250,000** 10:18 | **19th** 4:21 5:16 | **31** 57:17 |
| 59:12 62:10,15 | 21:6,7 | | 83:15 | **33401** 1:24 |
| 63:1 67:7 | **word** 82:2 | **#** | **1975** 2:8 | **33411** 2:9 |
| 72:23 | **words** 10:22 | **#1** 1:10 | | **33634** 2:5 |
| **wants** 33:15 | 35:16 74:14 | **#2** 1:10 | **2** | |
| 57:14 61:2 | **work** 9:23,24 | **#3** 1:10 | **2** 75:22 76:2,22 | **4** |
| 62:3 63:6 | 10:6 22:20 | | 78:4 | **4** 1:11 3:4,13 |
| **warning** 36:7 | 33:13 | **0** | **2/9** 70:21 | 51:18 53:3,6 |
| **wasn't** 38:18 | **working** 11:7 | **037322XXXX** | **2:26** 66:3 | 81:21 |
| 43:15,16 48:23 | 51:4 79:19 | 1:3 | **2:48** 66:4 | **40** 39:9 |
| 52:17 53:1 | **works** 29:23,25 | | **2:59** 1:20 84:12 | **47** 8:1 |
| 76:15 80:9 | **workstation** | **1** | **2006** 54:25 | |
| **waters** 60:22 | 70:8 | **1** 1:17 38:7 42:7 | **2006-AR4** 54:21 | **5** |
| **way** 2:8 11:3 | **wouldn't** 9:22 | 65:8 74:23 | 54:22 | **5** 38:7 76:2 |
| 23:22 27:24 | 39:11 46:22 | **1st** 54:25 | **2008** 1:3 41:20 | **50** 1:3 40:10 |
| 30:8 33:19 | 79:22,22 | **1,073** 13:16 | 42:25 44:7 | **500** 1:24 |
| 49:6 51:14,15 | **write** 45:6 | **10** 15:6,11,12,16 | 46:11 76:14 | **52** 7:22 |
| 56:20 57:13 | **writing** 34:17 | 38:8 72:8 73:2 | **2009** 1:19 4:21 | **561.682.0905** |
| 62:8 63:24 | **wrong** 51:13 | 73:13 | 70:21 79:4 | 1:25 |
| 64:23 73:24 | | **10:00** 47:12,14 | 83:13 | |
| 74:14 80:6 | **X** | **100** 15:4 39:21 | **2010** 83:23 | **6** |
| **week** 13:12,12 | **X** 3:1,11,16 | 72:8 73:2,3,7 | **204** 3:17 | **6,000** 13:18 |
| 13:18,25 19:22 | | 73:13,14 | **21** 34:15,24 37:8 | **60** 25:24 26:6 |
| 38:22 39:2 | **Y** | **104** 2:8 | 44:6,14 46:24 | 40:18 |
| **Wells** 28:23,25 | **Y** 3:17 | **11th** 5:9 | **21st** 34:24 35:12 | **60,000** 38:21 |
| 29:1,6 | **Yeah** 23:16 | **11:00** 47:13 | 41:20 42:25 | |
| **went** 19:1 23:5 | 43:20 75:3 | **113** 3:14 | 44:7 46:11,20 | **7** |
| **weren't** 44:10 | **year** 5:9,16 | **114** 3:14 | **21-day** 34:23 | **750** 13:22 |
| 79:23 | 37:25 44:11,12 | **12,000** 39:8 | **215** 3:5 | **77,000** 38:20 |
| **West** 1:20,24 | 76:11 | **12:00** 47:14 | **216** 3:6 | **7700** 4:15 |
| 2:9 4:15 28:15 | **yesterday** 58:20 | **12:54** 1:20 | **217** 3:7 | **78729** 4:16 |
| **we're** 5:23,24 | 61:10 | **120** 25:25 26:6 | **218** 3:8 | |
| 25:9,15 44:4 | **yes/no** 49:4,12 | 40:18 | **219** 3:9 | **8** |
| 51:4,5 52:6 | **York** 6:20,23,24 | **14** 44:13 | **24** 19:19 | **84** 1:17 |
| 68:10 79:23 | 6:25,25 | **14-day** 34:22 | **250** 10:10 | **88** 3:13 |
| **we've** 9:20 66:1 | | **15th** 76:14 | **250,000** 10:15 | |
| 79:10 | **Z** | **16** 42:14 | 11:8 | **9** |
| **whistles** 36:8 | **Z** 3:17 | **162** 3:15 | **29th** 83:13 | **9** 1:19 |
| **win** 82:7 | **ZACKS** 2:7 | **1655** 1:19,24 | | **9th** 79:4 |

Censor & Associates
Reporting and Transcription, Inc.

9119 2:4